**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| DAN RYAN BUILDERS WEST VIRGINIA, LLC, *f/k/a* DAN RYAN BUILDERS INC. and DAN RYAN BUILDERS SOUTH CAROLINA, LLC, | ) ) ) ) ) | |
| | ) | No. 2:18-cv-00589-DCN |
| Plaintiffs, | ) ) | |
| | ) | **ORDER** |
| vs. | ) ) | |
| MAIN STREET AMERICA ASSURANCE COMPANY, SELECTIVE INSURANCE GROUP, INC., THE CINCINNATI INSURANCE COMPANY, FRANKENMUTH MUTUAL INSURANCE CO., STATE AUTOMOBILE MUTUAL INSURANCE COMPANY, PENNSYLVANIA NATIONAL SECURITY INSURANCE COMPANY, and PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

This matter is before the court on plaintiffs Dan Ryan Builders West Virginia, LLC and Dan Ryan Builders South Carolina, LLC's (collectively, "DRB") motion for partial summary judgment, ECF No. 54, and defendant The Cincinnati Insurance Company's ("Cincinnati") motion for summary judgment, ECF No. 139. For the reasons set forth below, the court denies DRB's motion and grants in part and denies in part Cincinnati's motion.

## I.  BACKGROUND

This insurance dispute arises from a construction project managed by DRB, a construction company that primarily builds new homes. DRB secured a contract to

construct new homes in a community known as the Foxbank Subdivision in Berkeley County, South Carolina ("Foxbank" or the "Foxbank Subdivision"). In order to perform this contract, DRB hired various subcontractors. The defendants in this case are insurers of those subcontractors. Relevant to the instant motions, Cincinnati is the insurer of Firm Foundations, Inc. ("Firm Foundations"), one of DRB's subcontractors. Firm Foundations maintained a commercial general liability ("CGL") policy with Cincinnati (the "Cincinnati Policy") during the time that it allegedly performed work for DRB on Foxbank.

On April 24, 2014, two Foxbank Subdivision homeowners filed suit against DRB in the Court of Common Pleas for Berkeley County, South Carolina (the "Dickerson Lawsuit"). The Dickerson Lawsuit is a class action on behalf of other similarly situated owners of homes that were built by DRB. The lawsuit alleges property damage, such as "slabs and building components moving and/or cracking . . repeatedly and/or continuously and continu[ing] to occur causing damage to building components, the finish and structural elements of the home[s]." ECF No. 54-1 at 9. On March 22, 2017, more Foxbank homeowners filed a second action against DRB and several subcontractors, alleging similar harms as in the Dickerson Lawsuit (the "Tipton Lawsuit"). The two lawsuits have been consolidated in state court (the "underlying lawsuit").

After it received claims from the Foxbank homeowners but before the homeowners filed suit, DRB notified Firm Foundations and Greg Seidel, a claims representative for Cincinnati, of the Foxbank Homeowner's claims against it and tendered a demand for defense and indemnity via two letters dated January 8, 2014 and

January 15, 2014. After Foxbank homeowners filed the Dickerson lawsuit, DRB renewed its demand for defense and indemnity to Seidel on or around September 19, 2014. On October 1, 2014, Seidel responded, informing DRB that Cincinnati was denying DRB's claim for defense and indemnity. Cincinnati now argues that DRB is not an insured under the Cincinnati Policy.

On March 1, 2018, DRB filed this lawsuit against the insurers of the subcontractors who allegedly performed work on the Foxbank project, seeking a declaratory judgment that the underlying lawsuits set forth claims that are covered under each of defendant's CGL policies and that defendants have a duty to defend and indemnify DRB in these underlying lawsuits. DRB also brought claims for bad faith refusal to pay first party benefits and for indemnification / contribution. On September 27, 2018, DRB filed an amended complaint, adding a fourth cause of action for promissory estoppel, arguing that defendants allowed certificates of insurance to be issued to DRB upon which DRB reasonably relied.

On October 3 and 26, 2018, DRB filed motions for partial summary judgment against all insurer-defendants, asking the court to declare that it is entitled to coverage. ECF Nos. 54, 55, 56, 57, 74, and 75, respectively. Each of the insurer-defendants have since also filed motions for summary judgment. ECF Nos. 118, 135, 138, 139, 140, and 143. The court held a hearing on DRB's motions on January 8, 2019 and a hearing on the defendants' motions on August 8, 2019. In all, twelve summary judgment motions await the court's resolution.

This order resolves two of those motions. On October 3, 2018, DRB filed a motion for partial summary judgment on its declaratory judgment claim against

Cincinnati.  On November 1, 2018, Cincinnati responded, ECF No. 80, and on December 12, 2018, DRB replied.  ECF No. 112.  On June 10, 2019, Cincinnati filed a cross-motion for summary judgment on all of DRB's claims against it.  ECF No. 139.  On June 20, 2019, DRB responded, ECF No. 154, and on June 26, 2019, Cincinnati replied, ECF No. 156.  Thus, this matter is ripe for the court's review.

## II.  STANDARD

Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Rule 56(c) of the Federal Rules of Civil Procedure requires that the district court enter judgment against a party who, "'after adequate time for discovery . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  Stone v. Liberty Mut. Ins. Co., 105 F.3d 188, 190 (4th Cir. 1997) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id. at 248.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The non-movant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

Any reasonable inferences are to be drawn in favor of the nonmoving party. Anderson, 477 U.S. at 255, Webster v. U.S. Dep't of Agric., 685 F.3d 411, 421 (4th Cir. 2012). However, to defeat summary judgment, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence. See Anderson, 477 U.S. at 252; Stone, 105 F.3d at 191. Rather, "a party opposing a properly supported motion for summary judgment . . . must 'set forth specific facts showing that there is a genuine issue for trial.'" Bouchat, 346 F.3d at 522 (quoting Fed. R. Civ. P. 56(e) (2002) (amended 2010)). If the adverse party fails to provide evidence establishing that the fact finder could reasonably decide in his favor, then summary judgment shall be entered "regardless of '[a]ny proof or evidentiary requirements imposed by the substantive law.'" Id. (quoting Anderson, 477 U.S. at 248).

### III. DISCUSSION

At the outset, the court wishes to clarify a matter of insurance law. It is well-settled in South Carolina that a liability insurer has a duty to defend its insured in a suit

that alleges harms payable under the terms of the policy.  <u>B.L.G. Enterprises, Inc. v. First</u>

<u>Fin. Ins. Co.</u>, 514 S.E.2d 327, 330 (S.C. 1999) (citing <u>Sloan Constr. Co. v. Central Nat'l</u>

<u>Ins. Co. of Omaha</u>, 236 S.E.2d 818 (S.C. 1977)).  It is also well-settled South Carolina

law that where the underlying complaint against an insured creates even the possibility of

coverage, the insurer is obligated to defend.  <u>Union Ins. Co. v. Soleil Grp., Inc.</u>, 465 F.

Supp. 2d 567, 572 (D.S.C. 2006) (quoting <u>Isle of Palms Pest Control Co. v. Monticello</u>

<u>Ins. Co.</u>, 459 S.E.2d 318, 319 (S.C. Ct. App. 1994)).

　　　　DRB and Cincinnati both cite to these cases, among others,[1] in arguing for and

against the existence of a duty to defend in this case.  However, the law established by or

applied in those cases, while at best instructive, is not directly on point.  In each of those

cases, there was no dispute that the plaintiff was an insured.  The issue before those

courts was whether some occurrence was covered by the policy between the undisputed

insurer and insured.  The issue here is different.  To determine whether Cincinnati owed a

duty to defend DRB in the underlying suit, the court must first determine whether DRB

was an insured with respect to the Cincinnati Policy at all.  In South Carolina, a party

seeking coverage has the burden to show that it is an insured.  <u>State Farm Mut. Auto. Ins.</u>

<u>Co. v. Logan</u>, 444 F. Supp. 2d 622, 626 (D.S.C. 2006) (citing <u>United States Fire Ins. Co.</u>

<u>v. Macloskie</u>, 465 S.E.2d 759, 760 (S.C. 1996)).[2]  Therefore, the court must first analyze

---

[1] DRB also relies upon <u>USAA Prop. & Cas. Ins. Co. v. Clegg</u>, 661 S.E.2d 791 (S.C. 2008) and <u>Gordon-Gallup Realtors, Inc. v. Cincinnati Ins. Co.</u>, 265 S.E.2d 38, 39 (S.C. 1980).  Neither case is directly on point.

[2] Both of these cases dealt with a party's burden to prove that it was covered under an insurance policy's "omnibus clause" as an additional insured, finding that the burden fell on the party seeking coverage.  Because an omnibus clause affords a third party to the insurance contract coverage in some circumstances, it is akin to the "additional insured" clause in the Cincinnati Policy.  Therefore, the court finds these cases persuasive and directly applicable to the current dispute.

whether DRB is an insured with respect to the Cincinnati Policy before it considers whether the underlying lawsuit is covered under the Cincinnati Policy.

In its motion for partial summary judgment, DRB argues that Cincinnati has a duty to defend DRB in the underlying suit on two grounds. First, it argues the terms of the Cincinnati Policy extend coverage to DRB as an "additional insured" to the policy. Alternatively, DRB argues that the issuance of several certificates of insurance by Cincinnati's agent conferred upon it "additional insured" coverage by estoppel, irrespective of the terms of the Cincinnati Policy. In its cross-motion for summary judgment, Cincinnati argues that neither the terms of the Cincinnati Policy nor the issuance of the certificates of insurance extend "additional insured" coverage to DRB as a matter of law. Therefore, Cincinnati argues, it has no duty to defend DRB in the underlying lawsuit and did not act in bad faith. Because the court finds that the existence of coverage depends on genuine issues of material fact, it denies DRB's motion in full and denies Cincinnati's motion with respect to DRB's declaratory judgment claim. However, the court also finds that DRB's promissory estoppel and bad faith claims fail as a matter of law and therefore grants Cincinnati's motion with respect to those claims.

### A. Coverage Under the Cincinnati Policy

"An insurance policy is a contract between the insured and the insurance company, and the terms of the policy are to be construed according to contract law." Auto Owners Ins. Co. v. Rollison, 663 S.E.2d 484, 487 (S.C. 2008). "The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." Beaufort Cty. Sch. Dist. v. United Nat'l Ins. Co., 709 S.E.2d 85, 90 (S.C. Ct. App. 2011) (citing Schulmeyer v. State Farm Fire & Cas.

Co., 579 S.E.2d 132, 134 (S.C. 2003)). "If the contract's language is clear and unambiguous, the language alone, understood in its plain, ordinary, and popular sense, determines the contract's force and effect." Id. (citing Schulmeyer, 579 S.E.2d at 134). However, an insurance contract which is "in any respect ambiguous or capable of two meanings" must be construed strictly against its drafter, the insurer. Reynolds v. Wabash Life Ins. Co., 161 S.E.2d 168, 169 (S.C. 1968)).

DRB argues that Cincinnati has a duty to defend DRB in the underlying lawsuit because DRB is entitled to coverage under the terms of the Cincinnati Policy. Although the Cincinnati Policy is an insurance policy between Cincinnati and its primary insured, Firm Foundations, DRB claims that it is entitled to coverage as an "additional insured" to the policy:

**SECTION II – WHO IS AN INSURED:**

**1.** Any person or organization described in Paragraph **9.a.(2)** below (hereinafter referred to as additional insured) whom you are required to add as an additional insured under this Coverage Part by reason of:

    **a.** A written contract or agreement; or

    **b.** An oral agreement or contract where a certificate of insurance showing that person or organization as an additional insured has been issued,

is an insured, provided:

    **a.** The written or oral contract or agreement is:

        **1.** Currently in effect or becomes effective during the policy period; and

        **2.** Executed prior to an "occurrence" or offense to which this insurance would apply; and

    **b.** They are not specifically named as an additional insured under any other provision of, or endorsement added to, this Coverage Part.

ECF No. 80-2 at 62.

Stated less enigmatically, the Cincinnati Policy provides two avenues for an entity to be added to the policy as an additional insured: (1) a written contract between the insured and the entity that requires the insured to add the entity to its CGL policy as an additional insured or (2) an oral contract that requires the insured to add the entity to its CGL policy as an additional insured, if the entity seeking additional insured coverage has been issued a certificate of insurance that evidences its coverage. DRB argues that it satisfies the terms of the Cincinnati Policy under both the "written contract" and the "oral contract plus certificate of insurance" avenues. The court addresses each avenue in turn.

### 1. Written Contract Avenue

The Cincinnati Policy would extend additional insured coverage to DRB if (1) a valid written contract existed between DRB and Firm Foundations (2) that required Firm Foundations to add DRB as an additional insured to the Cincinnati Policy. DRB first relies on a Trade Contract with Firm Foundations to satisfy this requirement. ECF No. 54-4 at 1 (the "Firm Foundations Trade Contract"). The Firm Foundations Trade Contract, dated November 8, 2013, outlines an agreement under which Firm Foundations would perform work for DRB at Foxbank.[3] DRB is correct that the contract includes a provision that would require Firm Foundations to add DRB as an additional insured to the

_____

[3] Cincinnati argues that the Firm Foundations Trade Contract cannot satisfy the terms of the Cincinnati Policy because it was sent to Firm Foundations some ten months after DRB learned of the Foxbank homeowner's claims against it and well after Firm Foundation's work on the Foxbank project was complete. In response, DRB argues that the parties assented to and operated under the Firm Foundations Trade Contract before Firm Foundations completed its work on Foxbank. The court need not resolve this factual issue, however, because it finds that the contract is invalid, as discussed below.

Cincinnati Policy.[4]  Importantly, however, on the contract's "due execution" page where the parties were supposed to sign, the signature line for Firm Foundations is blank.  This lack of execution renders the contract invalid, according to its own terms.

Article 12(b) of the General Conditions to the Firm Foundations Trade Contract provides that "[t]he Contract shall not become valid and effective or in force until the same has been <u>executed by the Contractor</u> [Firm Foundations] returned to and <u>executed by DRB</u> . . . ."  ECF No. 54-4 at 13 (emphasis added).  Black's Law Dictionary lists five alternative definitions of the word "execute," the two most pertinent of which provide conflicting meanings:

> **1.** To perform or complete (a contract or duty) <once the contract was fully executed, the parties owed no further contractual duties to each other>. . . .
>
> **3.** To make (a legal document) valid by signing; to bring (a legal document) into its final, legally enforceable form <each party executed the contract without a signature witness>. . . .

EXECUTE, Black's Law Dictionary (11th ed. 2019).  It would not make sense to apply the first definition—that the contract is executed once it is fully performed—since the purpose of a trade contract is to set the terms of a general contractor and subcontractor's relationship at the outset of a project.  Interpreting "execute" according to this definition would have the paradoxical effect of establishing binding conditions for a construction project only upon that project's completion.  Therefore, the court applies the other viable definition, which contains two further sub-definitions:  to make a legal document valid by

---

[4] Article 9 of the General Conditions to the Firm Foundations Trade Contract requires that "[p]rior to commencing any Work, Contractor [Firm Foundations] shall provide to DRB a Certificate of Insurance [ ] evidencing that Contractor maintains the insurance set forth below and naming DRB as an additional insured with respect to any general liability or automobile coverage."  ECF No. 54-4 at 10.

signing it or, more generally, to bring a legal document into its final, legally enforceable form, which may not require a signature.

Between these two definitions, the context of the term within the General Conditions reveals the most logical meaning—that "execute" means "signed." It would make little sense to conclude that Article 12 requires the contract to be brought into its final legally enforceable form by Firm Foundations and returned to DRB so that it too might bring the contract into its final legally enforceable form. The court reaches the only logical conclusion, that Article 12(b) of the General Conditions of the Land Site Contract requires that the contract to be signed by both parties before it becomes valid and enforceable. Because no one from Firm Foundations signed the "due execution" page of the contract, it was never "executed" and thus was never "valid and effective or in force." Therefore, the Firm Foundations Trade Contract cannot serve as a basis under the Cincinnati Policy for extending additional insured coverage to DRB.

DRB argues that this lack of signature is irrelevant because there is enough evidence to demonstrate that the parties intended to enter into the Firm Foundations Trade Contract, despite Firm Foundations never signing it. Under South Carolina law, "a contract does not always require the signature of both parties; it may be sufficient, if signed by one and accepted and acted on by the other." Jaffe v. Gibbons, 351 S.E.2d 343, 346 (Ct. App. 1986). "A written contract, not required to be in writing, is valid if one of the parties signs it and the other acquiesces therein. Acceptance of a contract by assenting to its terms, holding it and acting upon it, may be equivalent to a formal execution by one who did not sign it." Coves Darden, LLC v. Ibanez, 2016 WL

11

4379419, at *9–10 (S.C. Ct. App. 2016) (quoting Peddler, Inc. v. Rikard, 221 S.E.2d 115, 117 (S.C. 1975)).

While DRB is correct that a signature is not always required for a contract to be binding, in this instance the court need not look outside of the four corners of the contract to determine if the parties did in fact intend to enter into the Firm Foundations Trade Contract because the very terms of the General Conditions to the contract mandate that "[t]he Contract shall not become valid and effective or in force until the same has been executed," which the court interprets to mean "signed." ECF No. 54-4 at 13 (emphasis added). This provision is a clear condition precedent to the contract's validity. See M & M Grp., Inc. v. Holmes, 666 S.E.2d 262, 266 (S.C. Ct. App. 2008) ("The question of whether a provision in a contract constitutes a condition precedent is a question of construction dependent on the intent of the parties to be gathered from the language they employ."). Therefore, the Firm Foundations Trade Contract was never valid and never extended additional insured coverage to DRB.

DRB has also presented several other documents from DRB and Firm Foundation's contractor-subcontractor relationship: a Vendor / Subcontractor form, ECF No 54-4 at 14; scope-of-work-procedures documents, id. at 17–25 (which are not signed by Firm Foundations); a payment agreement, id. at 26–27; a business license, id. at 28–29; a W-9, id. at 20; a bid sheet, id. at 36–37; and a document titled "Exhibit E", id. at 35. With respect to these documents, DRB asserts two arguments. First, DRB argues that the documents prove that DRB and Firm Foundations in fact entered into and operated under the Firm Foundations Trade Contract, despite the contract lacking Firm Foundation's signature. Second, DRB argues that the documents themselves satisfy the terms of the

Cincinnati policy, triggering additional insured coverage. Both arguments are unconvincing.

With respect to DRB's first argument, none of the presented documents can overcome the fact that the Firm Foundations Trade Contract was never valid according to its own terms. The General Conditions to the Firm Foundations Trade contract require the contract to be "executed"—meaning "signed"—which it never was. Because a clear condition precedent to the contract was left unfulfilled, the court cannot enforce the contract's terms. To be sure, DRB and Firm Foundations maintained a contractual relationship at the time Firm Foundations performed work at Foxbank, and the documents that DRB presents evidence that fact. However, the documents are not evidence that the parties assented to the terms of the Firm Foundations Trade Contract, and no amount of evidence of DRB and Firm Foundations's relationship can save the Firm Foundations Trade Contract, which was never valid. No document that DRB could produce would require the court to enforce the terms of an invalid written contract. Therefore, the court rejects this argument.

DRB's second argument with respect to these documents—that they in themselves satisfy the terms of the Cincinnati Policy—is also unconvincing. None of the documents alone are sufficient to confer additional insured status to DRB under the Cincinnati Policy because none require Firm Foundations to add DRB to the policy as an additional insured. To be clear, the issue before the court is not whether DRB and Firm Foundations maintained a contractual relationship. It is uncontested that DRB and Firm Foundations entered into an agreement under which Firm Foundations performed work for DRB at Foxbank. The narrow issue critical here is whether there existed a valid

written contract between Firm Foundations and DRB that required Firm Foundations to add DRB as an additional insured to the Cincinnati Policy. The Cincinnati Policy requires more than a mere contract to perform work; the only contract that would extend additional insured coverage to DRB is one that requires Firm Foundations to add DRB as an additional insured. None of the presented documents, aside from the Firm Foundations Trade Contract, which was never valid, contain such a provision. The court will not impose a contract requirement upon Firm Foundations based on documents that do not include that requirement.

Although the court finds that none of the documents that DRB has presented are sufficient to confer additional insured coverage to DRB under the Cincinnati Policy, there is evidence in the record of a contract that would satisfy the terms of the Cincinnati Policy. DRB has presented testimony of Edwin Woods, its South Region President, that DRB and Firm Foundations entered into a trade contract prior to Firm Foundations' work at Foxbank. According to Woods, that trade contract contained provisions that required Firm Foundations to maintain a CGL policy and add DRB to that policy as an additional insured.

> 6. DRB contracted with the following pertinent subcontractors who performed work on the Foxbank Subdivision[:] A.C. & A. Concrete Inc.[], BR's Clearing and Grading, Inc.[], Firm Foundations, Inc.[], Land Site Services, LLC[], Southern Atlantic Construction, LLC[], and Marcinak Construction Company.
>
> 7. As a pre-requisite to performing work on the Foxbank Subdivision, DRB required each of the aforementioned subcontractors to execute a copy of DRB's Trade Contract, all of which contained DRB's General Conditions DRB Form C-2 . . . ."

. . .

11. DRB's General Conditions Form C-2, which was a part of the Trade Contracts DRB required each of its subcontractors to execute in order to perform work on Foxbank Subdivision required DRB's subcontractors to do the following, without limitation:

    a. Maintain CGL insurance coverage, including completed operations coverage;

    b. To insure DRB with primary coverage as an additional insured on the subcontractors' CGL insurance polies; and

    c. To provide DRB with a certificate of insurance showing these coverages were in place prior to commencing work on the Foxbank Subdivision . . . ."

ECF No. 109-2, Woods Aff. ¶¶ 6–11.[5] If such a trade contract between DRB and Firm Foundations existed, as Woods has testified, it would be sufficient to confer additional insured coverage to DRB under the Cincinnati Policy. Explaining why DRB has not presented such a trade contract as evidence in this matter, Woods testified that:

18. Over the years since work on the Foxbank Subdivision was completed, some records of Trade Contracts entered into between DRB and its subcontractors have been lost and/or are missing, despite DRB's extensive efforts to locate any and all records pertinent to this lawsuit and the [underlying lawsuit].

_____

[5] The court admits to some hesitation in considering this evidence. DRB did not argue that Woods' testimony created a genuine issue of disputed fact with respect to the existence of a trade contract in any of its briefs on the instant motions. Instead, DRB attached the affidavit to its repose to Frankenmuth's motion for summary judgment and cited to it for other arguments. ECF No. 109-2. Rule 56(c)(3) states that on summary judgment, "the court need consider only the cited materials. . . ." Fed. R. Civ. P. 56(c)(3). The court is wary of allowing a party to create a genuine dispute of material fact without providing the opposing party a fair opportunity to respond to the evidence. On the other hand, DRB did attach the affidavit to its response to Cincinnati's motion for summary judgment, and DRB makes substantive arguments with respect to the testimony in response to another defendant's summary judgment motion. See ECF No. 161 at 20. The court concludes that the greater sin would be to usurp the role of the jury and grant summary judgment in the face of a clear issue of disputed fact. Rule 56(c)(3) continues, ". . . but the court may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). The court exercises the discretion the latter clause of Rule 56(c)(3) affords it and considers Woods' affidavit, despite DRB not arguing that the testimony creates a genuine issue of material fact.

> 19. As a result, any and all records of Trade Contracts between DRB and the aforementioned subcontractors that are incomplete and/or are missing pages have simply been lost or are unable to be located.

Id. at ¶¶ 18–19.[6]  Discussed above, the terms of the Cincinnati Policy would be satisfied by a contract between DRB and Firm Foundations under which Firm Foundations was required to add DRB to the Cincinnati Policy as an additional insured; it does not require that DRB present such a contract to Cincinnati.  So long as a trade contract that meets the requirements of the Cincinnati Policy existed, as Woods has testified, DRB would be entitled to coverage as an additional insured to the policy.  Woods' testimony, therefore, creates a genuine dispute as to whether there existed a contract that would confer additional insured coverage to DRB under the Cincinnati Policy.

Thus, DRB has presented evidence that a valid written contract between it and Firm Foundations existed that would extend additional insured coverage to DRB under the Cincinnati Policy.  For these reasons, a genuine issue of material fact underlies DRB's status as an additional insured to the Cincinnati Policy.  As such, the court cannot grant summary judgment in favor of Cincinnati on DRB's duty to defendant claim.  However, the court's inquiry as to DRB's status as an additional insured under the Cincinnati Policy does not end there.  The Cincinnati Policy also provides for the addition of an additional insured based on an oral contract.

---

[6] The court's consideration of this evidence does not run afoul of the best evidence rule, which holds that secondary evidence, like testimony evidence, is admissible to prove the contents of a writing where "all the originals are lost or destroyed, and not by the proponent acting in bad faith."  Fed. R. Evid. 1004.  Here, there is no evidence that DRB acted in bad faith in losing the trade contracts it claims it had with its subcontractors.  Therefore, the fact that DRB cannot produce those contracts goes to the weight of the evidence, not its admissibility.

## 2. Oral Contract Avenue

Alternatively, the Cincinnati Policy would extend additional insured coverage to DRB if (1) Firm Foundations and DRB agreed in an oral contract that Firm Foundations would add DRB as an additional insured to the Cincinnati Policy and (2) at least one certificate of insurance espousing additional insurance coverage was issued to DRB.  The parties do not dispute that Firm Foundations's insurance agent, who procured the Cincinnati Policy, provided DRB with at least four Certificates of Insurance that espouse DRB's status as an additional insured.  See ECF No. 54-6.[7]  Therefore, the court must consider whether DRB and Firm Foundations entered into an oral contract under which Firm Foundations was required to add DRB as an additional insured to the Cincinnati Policy.  Because of the lack of undisputed evidence presented to the court, summary judgment on this issue is inappropriate.

The Cincinnati Policy unambiguously  provides that a party may be added as an additional insured pursuant to an oral agreement.  Curiously, neither party has presented evidence that such an oral agreement did or did not exist.  Neither party has cited to an affidavit, deposition, or other testimony that might indicate whether DRB did or did not enter into an oral agreement with Firm Foundations that might confer additional insured coverage.  Instead, each party conclusively asserts that such an oral agreement did or did not exist.  In its briefs in favor of summary judgment, DRB states that

> even if this Court should find that there is insufficient evidence of the existence of a written contract between DRB and Firm Foundations, DRB still qualifies as an additional insured pursuant to oral contract avenue of obtaining additional insured coverage under [the Cincinnati] Policy[],

---

[7] Whether the certificates of insurance are sufficient in themselves to confer additional insured coverage to DRB, irrespective of the terms of the Cincinnati Policy, is a different question and one that the court addresses below.

> because Firm Foundations performed work on behalf of Plaintiffs, pursuant to an agreement between the parties . . . .

ECF No. 112 at 13.  DRB does not provide the court with any evidence that might show an oral agreement with Firm Foundations under which Firm Foundations was required to add DRB to the Cincinnati Policy as an additional insured.[8]

> Similarly, Cincinnati emptily claims that

> any purported oral agreement would have come to fruition (1) after Firm Foundations' work on the Foxbank project was complete and (2) after the "occurrence" of property damage which was certainly prior to November 2013 (when Dan Ryan first sent the terms of the Trade Agreement to Firm Foundations). [9]

ECF No. 139-1 at 9.  As an initial matter, the court does not follow Cincinnati's logic as why an oral agreement couldn't have existed prior to Firm Foundations competing its work.  Further, Cincinnati points to no evidence that might clear up the court's confusion.  In fact, Cincinnati cites to no evidence which might suggest that an oral agreement did not exist.  In the absence of evidence, the court cannot grant summary judgment.  Therefore, the court finds that summary judgment is inappropriate on the issue of whether an oral agreement between Firm Foundations and DRB extended additional insured coverage to DRB under the Cincinnati Policy.  Thus, genuine issues of material fact underlie both avenues by which DRB might be entitled to coverage as an additional insured.

---

[8] DRB does point to the certificates of insurance as evidence that it and Firm Foundations entered into an oral agreement.  However, the certificates of insurance are, at best, tenuously linked to the existence of an oral agreement between DRB and Firm Foundations.  Standing alone, the certificates of insurance are not sufficient evidence for the court to find that an oral agreement that satisfied the terms of the Cincinnati Policy existed between DRB and Firm Foundations as a matter of law.

[9] The Cincinnati Policy states that the written or oral contract on which coverage is based must have been executed prior to an "occurrence." ECF No. 80-2 at 62.

### 3. Additional Insured Limitation

Cincinnati also argues that a limitation in the Cincinnati Policy precludes DRB from coverage as an additional insured. This argument is without merit.

The Cincinnati Policy sets out certain limitations with respect to additional insured coverage:

> **2.** Only the following persons or organizations are additional insureds under this endorsement . . .
>
> **(f)** . . . If there is no written contract or agreement, or if no period of time is required by the written contract or agreement, a person or organization's status as an insured under this endorsement ends when [Firm Foundation's] operations for that insured are completed . . .

ECF No. 80-2 at 62–64. In other words, where an additional insured's coverage is premised on an oral contract, its status as an insured lasts only until the primary insured's operation are complete.

With respect to this limitation, Cincinnati argues that there can be no coverage for DRB with respect to the underlying lawsuit because "Firm Foundations ceased operations at the Foxbank project in February 2013, well before the 'occurrence' of property damage as defined by the [Cincinnati] policy." ECF No. 139-1 at 10. While Cincinnati has presented evidence that Firm Foundations completed its work at Foxbank in February of 2013, see ECF No. 144, Daigle Aff. ¶ 8, it has presented no evidence which might support the contention that the "occurrence" on which the underlying lawsuit is based occurred after Firm Foundations completed its operations. Again, the court is left with no undisputed evidence that might justify summary judgment. As such, summary judgment is inappropriate. Thus, the court denies Cincinnati's motion for summary judgment with respect to DRB's declaratory judgment claim.

**B. Coverage Based on the Certificates of Insurance**

Because the court has determined that summary judgment is not available on this issue of whether DRB is covered under the terms of the Cincinnati Policy, it must now consider whether DRB is entitled to coverage by estoppel. DRB argues that the issuance of certificates of insurance, each of which espouses additional insured coverage, confers additional insured coverage to DRB because DRB reasonably relied on the certificates' statements of coverage. In other words, DRB argues that the issuance of certificates of insurance estops Cincinnati from denying DRB additional insured coverage. The court disagrees.

A certificate of insurance is a "document acknowledging that an insurance policy has been written[] and setting forth in general terms what the policy covers." CERTIFICATE, Black's Law Dictionary (11th ed. 2019). Generally, courts treat certificates of insurance as mere evidence of insurance coverage rather than operative documents that establish coverage. The Supreme Court, applying Pennsylvania law, has held that the terms of an insurance policy control over a certificate of insurance, finding that "a certificate [of insurance] is not part of the contract of, or necessary to, the insurance." Boseman v. Connecticut Gen. Life Ins. Co., 301 U.S. 196, 203 (1937); see also 17 Couch on Ins. § 242:33, Loss Payee as Third-Party Beneficiary ("Where an entity requires another to procure insurance naming it an additional insured, that party should not rely on a mere certificate of insurance, but should insist on a copy of the policy. A certificate of insurance is not part of the policy. . . ."). When in conflict, the terms of the policy, not the certificate, control. See Taylor v. Kinsella, 742 F.2d 709, 711 (2d Cir. 1984).

The analysis becomes more complex, however, when the issue is whether a certificate of insurance confers coverage to a supposed additional insured who would not otherwise be covered under the policy. South Carolina courts have not confronted the issue of whether certificates of insurance that espouse additional insured coverage are sufficient to confer coverage upon their holder by estoppel. However, the general constructs of the doctrine of estoppel in South Carolina are instructive.

"In appropriate circumstances, estoppel can be used to prevent the insurer from denying coverage to the insured." Stringer v. State Farm Mut. Auto. Ins. Co., 687 S.E.2d 58, 61 (S.C. Ct. App. 2009) (citing Koren v. Nat'l Home Life Assurance Co., 288 S.E.2d 392, 394 (S.C. 1982)).

> The essential elements of estoppel as related to the party estopped are: (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, the essential elements are: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question, (2) reliance upon the conduct of the party estopped, and (3) prejudicial change in position.

S. Dev. Land & Golf Co. v. S.C. Pub. Serv. Auth., 426 S.E.2d 748, 750 (S.C. 1993) (internal citations omitted). Further, "the reliance by the party claiming estoppel must be reasonable, and it must proceed in good faith." Provident Life & Acc. Ins. Co. v. Driver, 451 S.E.2d 924, 928 (S.C. Ct. App. 1994) (citing S. Dev. Land & Golf Co. v. S.C. Pub. Serv. Auth., 426 S.E.2d 748, 751 (S.C. 1993)).

Courts outside of South Carolina are split regarding whether an insurer can be estopped from denying coverage to a certificate holder where the certificate of insurance purports to extend additional insured coverage. Some courts have estopped insurers from

denying coverage where a certificate of insurance identifies a third party as an additional insured . See Sumitomo Marine & Fire Ins. Co. of Am. v. S. Guar. Ins. Co. of Georgia, 337 F. Supp. 2d 1339 (N.D. Ga. 2004) (applying Georgia law); Blackburn, Nickels & Smith, Inc. v. Nat'l Farmers Union Prop. & Cas. Co., 482 N.W.2d 600, 604 (N.D. 1992) (applying North Dakota law); Marlin v. Wetzel Cty. Bd. of Educ., 569 S.E.2d 462, 472 (W. Va. 2002).  Other courts have refused to apply estoppel to confer coverage upon a certificate holder.  See Mulvey Const., Inc. v. Bituminous Cas. Corp., 571 F. App'x 150 (4th Cir. 2014) (applying Virginia law); Vinco Inc. v. Royal Ins. Co. of Am., 29 F. App'x 753 (2d Cir. 2002) (applying Connecticut law); TIG Ins. Co. v. Sedgwick James of Washington, 184 F. Supp. 2d 591 (S.D. Tex. 2001), aff'd, 276 F.3d 754 (5th Cir. 2002) (applying Texas law); G.E. Tignall & Co. v. Reliance Nat. Ins. Co., 102 F. Supp. 2d 300, 304 (D. Md. 2000) (applying Maryland law); Am. Country Ins. Co. v. Kraemer Bros., 699 N.E.2d 1056, 1060 (Ill. 1998).

Notably, the courts that refused to apply the doctrine of estoppel to extend coverage found that the supposed additional insureds' reliance on the certificates was not reasonable due to disclaimers printed on the certificates.  See Mulvey Const., 571 F. App'x at 159 ("The certificates of insurance included [a] direct and specific disclaimer . . . . We, like the district court, must conclude that Virginia would not recognize the use of estoppel to change the policy in the circumstances of this case."); TIG Ins. Co., 184 F. Supp. 2d at 597–98 ("The certificate of insurance [] clearly states that the certificate is issued 'as a matter of information only,' and that it does not purport to 'amend, extend, or alter' the terms of any insurance policies listed therein."); Kraemer Bros., 699 N.E.2d at 1060 ("If [a] certificate includes a disclaimer, the insured may not rely on representations

made in the certificate but must look to the policy itself to determine the scope of coverage.").

DRB has presented four certificates of insurance, which DRB claims Firm Foundations provided to DRB to indicate that the Cincinnati Policy extended coverage to DRB as an additional insured. DRB contends that Snellings-Walters insurance agency issued these certificates of insurance to Firm Foundations, who in turn provided them to DRB. Indeed, the certificates indicate that DRB is covered under the Cincinnati Policy as an additional insured. See ECF No. 54-6 at 1, 4, 6, and 7. Importantly, though, the certificates all contain two explicit disclaimers, located at the top of each document in conspicuous script:

> THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(s), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.
>
> …
>
> IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. . . . A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsements.

Id.

The court finds that these conspicuous disclaimers preclude a finding of estoppel because they render DRB's reliance upon the certificates of insurance unreasonable. Not only do the certificates indicate that they are issued as "matter[s] of information only", but they also give clear and specific notice to supposed additional insureds that the certificates "do[] not confer rights" without an endorsement to the policy. Further, the

disclaimers appear in conspicuous font on the top of each certificate. The court cannot imagine that South Carolina law would stretch the doctrine of equitable estoppel so far as to cover reliance upon certificates with such clear and conspicuous disclaimers.

DRB relies upon two cases for its argument that the certificates of insurance confer coverage by estoppel: <u>Sumitomo Marine & Fire Ins. Co. of Am. v. S. Guar. Ins. Co. of Georgia</u>, 337 F. Supp. 2d 1339 (N.D. Ga. 2004) and <u>Marlin v. Wetzel Cty. Bd. of Educ.</u>, 569 S.E.2d 462, 472 (W. Va. 2002). Because neither case analyzes the issue of the certificates' disclaimers, the court finds these cases unconvincing.

In <u>Sumitomo</u>, the court held that an insurer was estopped from denying coverage to a supposed additional insured where the insurer's agent issued the supposed additional insured certificates of insurance indicating that coverage existed. 337 F. Supp. 2d at 1355–56. The court reasoned that the insurer's agent had both actual and apparent authority from the insurer to issue the certificates and that the supposed additional insured reasonably relied thereon. The court reasoned that although a certificate of insurance is generally regarded as mere evidence of coverage, certificates in the construction context are used by general contractors as evidence that they are covered under their subcontractor's CGL policy. Without a certificate, the court posited, a general contractor would not permit its subcontractor to perform work. Therefore, the court found the general contractor's reliance on a certificate of insurance reasonable.

The court in <u>Marlin</u>, applying the same concepts to West Virginia law, stated:

> a certificate of insurance is evidence of insurance coverage, and is not a separate and distinct contract for insurance. However, because a certificate of insurance is an insurance company's written representation that a policyholder has certain insurance coverage in effect at the time the certificate is issued, the insurance company may be estopped from later denying the existence of that coverage when the policyholder or the

recipient of a certificate has reasonably relied to their detriment upon a
misrepresentation in the certificate.

569 S.E.2d at 472–73.  Neither of the cases on which DRB relies analyzed the issue of

the certificates' disclaimers beyond a passing reference, Sumitomo, 337 F. Supp. 2d at

1355 (stating only, "[d]efendants then point out that the Certificates of Insurance also

expressly included a disclaimer that they are for information purposes only and do not

amend the respective policies of insurance.  The parties have not submitted any binding

authority squarely on point."), and this court cannot ascertain the nature or scope of the

disclaimers that were present in those cases.  As such, neither case gives the court reason

to find that DRB's reliance on the certificates of insurance was reasonable in the face of

the clear and conspicuous disclaimers printed upon each. Therefore, the court finds that

the certificates of insurance did not confer additional insured coverage to DRB through

estoppel.

### C.  Cincinnati's Failure to Provide DRB with the Policy

Additionally, DRB argues that Cincinnati cannot rely upon a policy provision to

exclude it from coverage when it did not produce a copy of the policy to DRB.  This

argument is unconvincing, as are the cases DRB cites in support.  DRB argues that

"Cincinnati cannot rely upon policy provision to exclude coverage when it did not

produce a copy of the policy to [DRB]."  ECF No. 154 at 13.  As an initial matter, the

court points out that the Cincinnati Policy does not exclude DRB from coverage by

means of an exclusion to the policy.  An exclusion is an area of coverage that the insurer

removes from a policy that would otherwise be covered by the policy.  See

EXCLUSION, Black's Law Dictionary (11th ed. 2019).  The provision at issue here

would not exclude DRB from coverage, it would extend coverage to DRB in the first

place.  In short, the provision that determines whether or not DRB is entitled to coverage is not an exclusion.  The cases on which DRB relies suffer from a similar fatal flaw and miss the mark.[10]

In each of the cases on which DRB relies, an insurer failed to provide a copy of the policy to its insured.  Instead, the insured held a certificate of insurance.  Under those circumstances those courts found that the certificates held by the insureds controlled over exclusions found in the policy, to which the insureds did not have access.  The present circumstances are different.  Here, the question is whether DRB is an insured, not whether a certain occurrence is covered or excluded under the policy.  Further, unlike the status of the plaintiffs in those cases, DRB's status as an insured is uncertain.  It would make little sense for the court to hold that Cincinnati was required to provide a copy of the Cincinnati Policy to DRB, a third party who the court has not found is covered by the Cincinnati Policy.  The doctrine employed by these cases is plainly inapplicable to the case at hand.  Therefore, the court rejects this argument.

In sum, the court cannot grant summary judgment to either party on DRB's declaratory judgment claim.  Summary judgment is not warranted on behalf of Cincinnati because whether DRB is entitled to coverage as an additional insured to the Cincinnati Policy, based on an oral agreement, is a disputed issue of material fact.  Further, DRB is not entitled to summary judgement for the same reason, and because its alternative

---

[10] In support of its argument, DRB cites to:  <u>Brown Mach. Works & Supply Co. v. Ins. Co. of N. Am.</u>, 659 So. 2d 51, 56 (Ala. 1995); <u>Moore v. Energy Mut. Ins. Co.</u>, 814 P.2d 1141, 1144 (Utah Ct. App. 1991); and <u>J. M. Corbett Co. v. Ins. Co. of N. Am.</u>, 357 N.E.2d 125, 128 (Ill. App. 1976).  Because each case suffers from the same fatal flaw, the court discusses them together.

estoppel claim fails.  As such, DRB's declaratory judgment claim as to Cincinnati's duty to defend and indemnify DRB in the underlying suit survives.

### D. DRB's Remaining Claims

Having resolved the legal issues put before it, the court must now determine the practical effect of its findings.  By way of clarification, DRB and Cincinnati have both filed motions for summary judgment.  DRB's motion requests summary judgment solely on its declaratory judgment claim, which asks the court to find that Cincinnati has a duty to defend DRB in the underlying lawsuit.  Cincinnati's motion, on the other hand, asks the court to grant summary judgment "in [Cincinnati's] favor as to all of the Plaintiffs' [] claims against [it]."  ECF No. 139 at 1.  However, Cincinnati does not specifically request summary judgment on DRB's claims for indemnification or promissory estoppel.  Nor does Cincinnati explicitly address these claims in its motion.

However, this order's resolution of the declaratory judgment claim has required the court to determine issues that are part and parcel to DRB's promissory estoppel claim.  Specifically, this order has found that Cincinnati is not estopped from denying coverage to DRB because DRB's reliance on the certificates of insurance was unreasonable as a matter of law.  This finding goes to the very heart of DRB's promissory estoppel claim.  "The elements of promissory estoppel are (1) an unambiguous promise by the promisor; (2) reasonable reliance on the promise by the promisee; (3) reliance by the promisee was expected by and foreseeable to the promisor; and (4) injury caused to the promisee by his reasonable reliance." N. Am. Rescue Prod., Inc. v. Richardson, 769 S.E.2d 237, 241 (S.C. 2015) (citing Davis v. Greenwood Sch. Dist. 50, 634, 620 S.E.2d 65, 67 (S.C. 2005)).  DRB's promissory estoppel claim fails because this order finds that its reliance

on the certificates of insurance was not reasonable. Therefore, the court's findings renders DRB's promissory estoppel claim untenable.

Next, the court turns to DRB's bad faith claim. "The elements of a bad faith refusal to pay action are (1) the existence of a contract of insurance between the parties; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action; and (4) causing damage to the insured." Crossley v. State Farm Mut. Auto. Ins. Co., 415 S.E.2d 393, 396–97 (S.C. 1992). "But if there is a reasonable ground for contesting a claim, there is no bad faith." Helena Chem. Co. v. Allianz Underwriters Ins. Co., 594 S.E.2d 455, 462 (S.C. 2004) (quoting Crossley, 415 S.E.2d at 397 (internal quotation marks omitted). DRB has admitted that it has lost some of the documents that it claims would otherwise establish coverage in this case. Although the Cincinnati policy does not require DRB to present a contract to prove it is entitled to additional insured coverage, it would make little sense to hold that Cincinnati's denial of coverage, in the absence of such a contract and clear evidence of an oral agreement, was unreasonable. Based on the lengthy analysis above, Cincinnati had reasonable grounds for its conclusion that DRB was not an additional insured under the Cincinnati Policy. Therefore, DRB's claim for bad faith must fail.

As such, the court finds itself at a procedural fork in the road[11] and must choose between the lesser of two evils. The court must either grant summary judgment on DRB's claims of promissory estoppel and bad faith in favor of a party who did not explicitly request it or deny summary judgment and send legally untenable claims to a

---

[11] As the sagacious Yogi Berra once said, "When you come to a fork in the road, take it."

jury.  The court determines that the latter is the greater evil, so it proceeds with the former.  Thus, because the court's finding necessitates it, the court grants summary judgment in favor of Cincinnati with respect to DRB's promissory estoppel and bad faith claims.

The same cannot be said for DRB's claim for indemnification / contribution. Although the court is unsure of the nature or validity of the indemnification DRB seeks— be it contractual or equitable—the court is unwilling to grant summary judgment on a claim that may be viable in favor of a party who has not explicitly requested it.  Without such a request or findings that necessitate summary judgment, the court declines to consider DRB's claim for indemnification / contribution at present and denies Cincinnati's motion for summary judgment with respect to the same.

In sum, after the court's resolution of the instant motions, DRB's declaratory judgment and indemnification / contribution claim survive and will proceed to trial; DRB's bad faith and promissory estoppel causes of action are resolved on summary judgment in favor of Cincinnati.

## IV.   CONCLUSION

For the foregoing reasons the court **DENIES** plaintiffs' motion for summary judgment and **GRANTS IN PART** defendant's motion with respect to plaintiffs' second and fourth causes of action and **DENIES IN PART** defendant's motion with respect to plaintiffs' first and third causes of action.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**April 3, 2020**
**Charleston, South Carolina**