**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| DAN RYAN BUILDERS WEST ) | |
| VIRGINIA, LLC, *f/k/a* DAN RYAN ) | |
| BUILDERS INC. and DAN RYAN ) | |
| BUILDERS SOUTH CAROLINA, LLC, ) | |
| ) | No. 2:18-cv-00589-DCN |
| Plaintiffs, ) | |
| ) | **ORDER** |
| vs. ) | |
| ) | |
| MAIN STREET AMERICA ASSURANCE ) | |
| COMPANY, SELECTIVE INSURANCE ) | |
| GROUP, INC., THE CINCINNATI ) | |
| INSURANCE COMPANY, ) | |
| FRANKENMUTH MUTUAL ) | |
| INSURANCE CO., STATE ) | |
| AUTOMOBILE MUTUAL INSURANCE ) | |
| COMPANY, PENNSYLVANIA ) | |
| NATIONAL SECURITY INSURANCE ) | |
| COMPANY, and PENNSYLVANIA ) | |
| NATIONAL MUTUAL CASUALTY ) | |
| INSURANCE COMPANY, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

This matter is before the court on plaintiffs Dan Ryan Builders West Virginia,

LLC and Dan Ryan Builders South Carolina, LLC's (collectively, "DRB") motion for

partial summary judgment, ECF No. 56, and defendant Main Street America Assurance

Company's ("Main Street") motion for summary judgment, ECF No. 143. For the

reasons set forth below, the court denies DRB's motion for partial summary judgment

and grants in part and denies in part Main Street's motion for summary judgment.

## I.  BACKGROUND

This insurance dispute arises from a construction project managed by DRB, a

construction company that primarily builds new homes. DRB secured a contract to

construct new homes in a community known as the Foxbank Subdivision in Berkeley County, South Carolina ("Foxbank" or the "Foxbank Subdivision"). In order to perform this contract, DRB hired various subcontractors. The defendants in this case are insurers of those subcontractors. Relevant to the instant motions, Main Street is the insurer of A.C. & A. Concrete ("AC&A"), one of DRB's subcontractors. AC&A maintained a commercial general liability ("CGL") policy with Main Street (the "Main Street Policy") during the time that it allegedly performed work for DRB on Foxbank.

On April 24, 2014, two Foxbank Subdivision homeowners filed suit against DRB in the Court of Common Pleas for Berkeley County, South Carolina (the "Dickerson Lawsuit"). The Dickerson Lawsuit is a class action on behalf of other similarly situated owners of homes that were built by DRB. The lawsuit alleges property damage, such as "slabs and building components moving and/or cracking . . repeatedly and/or continuously and continu[ing] to occur causing damage to building components, the finish and structural elements of the home[s]." ECF No. 54-1 at 9. On March 22, 2017, more Foxbank homeowners filed a second action against DRB and several subcontractors, alleging similar harms as in the Dickerson Lawsuit (the "Tipton Lawsuit"). The two lawsuits have been consolidated in state court (the "underlying lawsuit").

On or around November 27, 2013, after it received claims from the Foxbank Subdivision homeowners but before the homeowners filed suit, DRB notified Main Street's claim department of the claims and tendered a demand for defense and indemnity under the Main Street Policy. In a September 26, 2017 letter, Main Street denied DRB's demand for defense and indemnity. On December 7, 2017, DRB demanded defense and

indemnity on Main Street with respect to the Tipton Lawsuit. Main Street had not provided a defense or indemnity to DRB in the underlying suit.

On March 1, 2018, DRB filed this lawsuit against the insurers of the subcontractors who allegedly performed work on the Foxbank project, seeking a declaratory judgment that the underlying lawsuits set forth claims that are covered under each of defendant's CGL policies and that defendants have a duty to defend and indemnify DRB in these underlying lawsuits. DRB also brought claims for bad faith refusal to pay first party benefits and for indemnification / contribution. On September 27, 2018, DRB filed an amended complaint, adding a fourth cause of action for promissory estoppel, arguing that defendants allowed certificates of insurance to be issued to DRB upon which DRB reasonably relied.

On October 3 and 26, 2018, DRB filed motions for partial summary judgment against all insurer-defendants, asking the court to declare that it is entitled to coverage. ECF Nos. 54, 55, 56, 57, 74, and 75, respectively. Each of the insurer-defendants have since also filed motions for summary judgment. ECF Nos. 118, 135, 138, 139, 140, and 143. The court held a hearing on DRB's motions on January 8, 2019 and a hearing on the defendants' motions on August 8, 2019. In all, twelve summary judgment motions await the court's resolution.

This order resolves two of those motions. On October 3, 2018, DRB filed a motion for partial summary judgment on its declaratory judgment claim against Main Street. ECF No. 56. On October 31, 2018, Main Street responded, ECF No. 76, and on December 12, 2018, DRB replied, ECF No. 111. On June 12, 2019, Main Street filed a cross-motion for summary judgment on all of DRB's claims against it. ECF No. 143.

DRB responded on July 10, 2019, ECF No. 161, and Main Street filed a reply on July 17, 2019, ECF No. 163.   Thus, this matter is ripe for the court's review.

## II.  STANDARD

Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Rule 56(c) of the Federal Rules of Civil Procedure requires that the district court enter judgment against a party who, "'after adequate time for discovery . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  Stone v. Liberty Mut. Ins. Co., 105 F.3d 188, 190 (4th Cir. 1997) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id. at 248.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by

4

demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The non-movant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

Any reasonable inferences are to be drawn in favor of the nonmoving party. Anderson, 477 U.S. at 255, Webster v. U.S. Dep't of Agric., 685 F.3d 411, 421 (4th Cir. 2012). However, to defeat summary judgment, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence. See Anderson, 477 U.S. at 252; Stone, 105 F.3d at 191. Rather, "a party opposing a properly supported motion for summary judgment . . . must 'set forth specific facts showing that there is a genuine issue for trial.'" Bouchat, 346 F.3d at 522 (quoting Fed. R. Civ. P. 56(e) (2002) (amended 2010)). If the adverse party fails to provide evidence establishing that the fact finder could reasonably decide in his favor, then summary judgment shall be entered "regardless of '[a]ny proof or evidentiary requirements imposed by the substantive law.'" Id. (quoting Anderson, 477 U.S. at 248).

### III. DISCUSSION

At the outset, the court wishes to clarify a matter of insurance law. It is well-settled in South Carolina that a liability insurer has a duty to defend its insured in a suit that alleges harms payable under the terms of the policy. B.L.G. Enterprises, Inc. v. First Fin. Ins. Co., 514 S.E.2d 327, 330 (S.C. 1999) (citing Sloan Constr. Co. v. Central Nat'l Ins. Co. of Omaha, 236 S.E.2d 818 (S.C. 1977)). It is also well-settled South Carolina law that where the underlying complaint against an insured creates even the possibility of

5

coverage, the insurer is obligated to defend.  Union Ins. Co. v. Soleil Grp., Inc., 465 F.

Supp. 2d 567, 572 (D.S.C. 2006) (quoting Isle of Palms Pest Control Co. v. Monticello

Ins. Co., 459 S.E.2d 318, 319 (S.C. Ct. App. 1994)).

     DRB and Main Street both cite to these cases, among others,[1] in arguing for and

against the existence of a duty to defend in this case.  However, the law established by or

applied in those cases, while at best instructive, is not directly on point.  In each of those

cases, there was no dispute that the plaintiff was an insured.  The issue before those

courts was whether some occurrence was covered by the policy between the undisputed

insurer and insured.  The issue here is different.  To determine whether Main Street owed

a duty to defend DRB in the underlying suit, the court must first determine whether DRB

was an insured with respect to the Main Street Policy at all.  In South Carolina, a party

seeking coverage has the burden to show that it is an insured.  State Farm Mut. Auto. Ins.

Co. v. Logan, 444 F. Supp. 2d 622, 626 (D.S.C. 2006) (citing United States Fire Ins. Co.

v. Macloskie, 465 S.E.2d 759, 760 (S.C. 1996)).[2]  Therefore, the court must first analyze

whether DRB is an insured with respect to the Main Street Policy before it considers

whether the underlying lawsuit is covered under the Main Street Policy.  Finding that the

first question depends on issues of disputed fact, the court need not reach the second.

---

[1] DRB also relies upon USAA Prop. & Cas. Ins. Co. v. Clegg, 661 S.E.2d 791 (S.C. 2008); Gordon-Gallup Realtors, Inc. v. Cincinnati Ins. Co., 265 S.E.2d 38, 39 (S.C. 1980); and C.D. Walters Const. Co. v. Fireman's Ins. Co. of Newark, New Jersey, 316 S.E.2d 709 (S.C. Ct. App. 1984).  None of these cases are directly on point.

[2] Both of these cases dealt with a party's burden to prove that it was covered under an insurance policy's "omnibus clause" as an additional insured, finding that the burden fell on the party seeking coverage.  Because an omnibus clause affords a third party to the insurance contract coverage in some circumstances, it is akin to the "contractors extension endorsement" in the Main Street Policy.  Therefore, the court finds these cases persuasive and directly applicable to the current dispute.

In its motion for partial summary judgment, DRB argues that Main Street has a duty to defend DRB in the underlying lawsuit on two alternative grounds.  First, it argues that the terms of the Main Street Policy extend coverage to DRB as an "additional insured" to the policy under the "contractors extension endorsement."  In the alternative, DRB argues that the issuance of several certificates of insurance by Main Street's agent conferred upon it "additional insured" coverage by estoppel, irrespective of the terms of the Main Street Policy.  In its cross-motion for summary judgment, Main Street argues that neither the terms of the Main Street Policy nor the issuance of the certificates of insurance extend "additional insured" coverage to DRB as a matter of law.  Therefore, Main Street argues, it has no duty to defend DRB in the underlying lawsuit.  Because whether DRB is entitled to coverage under the Main Street Policy depends on genuine issues of disputed fact, summary judgment is inappropriate on DRB's declaratory judgment claim.  However, for the following reasons, the court grants summary judgment in favor of Main Street on DRB's promissory estoppel and bad faith claims.

## A.  Coverage Under the Main Street Policy

"An insurance policy is a contract between the insured and the insurance company, and the terms of the policy are to be construed according to contract law." Auto Owners Ins. Co. v. Rollison, 663 S.E.2d 484, 487 (S.C. 2008).  "The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language."  Beaufort Cty. Sch. Dist. v. United Nat'l Ins. Co., 709 S.E.2d 85, 90 (S.C. Ct. App. 2011) (citing Schulmeyer v. State Farm Fire & Cas. Co., 579 S.E.2d 132, 134 (S.C. 2003)).  "If the contract's language is clear and unambiguous, the language alone, understood in its plain, ordinary, and popular sense,

determines the contract's force and effect."  Id. (citing Schulmeyer, 579 S.E.2d at 134).

However, an insurance contract which is "in any respect ambiguous or capable of two

meanings" must be construed strictly against its drafter, the insurer.  Reynolds v. Wabash

Life Ins. Co., 161 S.E.2d 168, 169 (S.C. 1968)).

As the basis of its declaratory judgment claim, DRB argues that it is entitled to

coverage under the terms of the Main Street Policy.  Although the Main Street Policy is

an insurance policy between Main Street and its primary insured, AC&A, DRB claims it

is entitled to coverage as an "additional insured" under the policy's "contractors

extension endorsement."  That endorsement states:

**A.  Additional Insureds**

Each of the following is added to Paragraph **C. Who Is An Insured of [the Business Owners Coverage Form] - Section II - Liability** but only as specifically described by the following:

1. Any person(s) or organization(s) for whom you are performing operations is also an additional insured, when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage", "personal and advertising injury" caused in whole or part, by:

> a. Your acts or omissions; or

> b. The acts or omissions of those acting on your behalf;

In the performance of your ongoing operations or "your work" included within the "products-completed operations" hazard for the additional insured at the location designated and described in the written contract or agreement.

ECF No. 56-8 at 32 (emphasis in original).

Stated less enigmatically, the Main Street Policy only extends additional insured coverage to DRB if (1) a written contract existed between DRB and AC&A[3] (2) that required AC&A to add DRB as an additional insured to the Main Street Policy. DRB first relies on a September 23, 2013 trade contract with AC&A to satisfy this requirement. ECF No. 56-4 at 1 (the "2013 AC&A Trade Contract"). The 2013 AC&A Trade Contract outlines an agreement between DRB and AC&A under which AC&A would perform work for DRB. DRB is correct that the contract includes a provision that would require AC&A to add DRB as an additional insured to the Main Street Policy. The 2013 AC&A Trade Contract is signed by AC&A and thus enforceable. However, Main Street argues that the 2013 AC&A Trade Contract does not entitle DRB to coverage because the contract was not executed until after AC&A had completed its work on Foxbank.

---

[3] The Main Street Policy states that DRB and AC&A must have "agreed in writing in a contract or agreement" that AC&A will add DRB to the policy as an additional insured. DRB contends that the court should interpret this language as requiring either an oral or written contract. According to DRB the

> phrasing is not plainly clear as to whether the word 'writing' applies to both the word 'contract' and the word 'agreement'. Therefore, the policy language could be interpreted to means that an organization has additional insured coverage if it requires the named insured to provide such coverage in a 'written contract' or in an 'agreement' that does not have to be written.

ECF No. 161 at 18.

The court finds this interpretation to be a bridge too far. For one, the phrase "in writing in a contract or agreement" clearly indicates that a writing is necessary. Further, the Main Street Policy goes on to describe the project location as "the location designated and described in the written contract or agreement." ECF No. 56-8 at 32. The only reasonable interpretation of that provision is as requiring the location to be described and designated in a written agreement. While the court is cognizant that ambiguities in an insurance policy are to be construed strictly against the insurer, Am. Credit of Sumter, Inc. v. Nationwide Mut. Ins. Co., 663 S.E.2d 492, 495 (S.C. 2008), it cannot insert ambiguity into an insurance policy where none exists, Beaufort Cty. Sch. Dist., 709 S.E.2d at 90. Therefore, the court finds that the Main Street Policy requires a written contract for the purposes of adding an additional insured to the policy.

AC&A's role in the Foxbank subdivision project was to lay the concrete foundations for the homes. Main Street has presented evidence that only one of the houses involved in the underlying lawsuit was issued a certificate of occupancy after September 23, 2013, the date the 2013 AC&A Trade Contract was signed. Mainstreet argues that AC&A must have completed its work by that date because the final house in the subdivision was issued a certificate of occupancy on January 17, 2014. Any factual dispute that AC&A was performing work between September 23, 2013 and January 17, 2014 is not genuine, Main Street argues, because AC&A was involved in the very early stages of construction, and it would be nearly impossible for a house that has its foundation poured in September to receive a certificate of occupancy in January. DRB, however, argues that an "AC&A invoice is dared January 17, 2014, which indicates that there is, at the very least, a possibility that AC&A was still performing work at Foxbank Subdivision at the time the September 2013 Trade Contract was executed." ECF No. 161 at 26. The court need not determine whether this factual dispute is genuine, however, because a different clear issue of material fact precludes summary judgment on DRB's duty to defend claim.

DRB has presented evidence of an earlier trade contract between DRB and AC&A that creates a clear issue of material fact. DRB has presented evidence that DRB and AC&A entered into a trade contract in 2006 (the "2006 AC&A Trade Contract"), prior to AC&A's commencement of work on Foxbank. Main Street does not deny that DRB and AC&A entered into the 2006 AC&A Trade Contract. Instead, the parties dispute whether the 2006 AC&A Trade Contract included terms that required AC&A to add DRB to the Main Street Policy as an additional insured. DRB argues that the 2006

AC&A Trade Contract included terms identical to those of the 2013 AC&A Trade

Contract. DRB has presented testimony of Edwin Woods, its South Region President,

that DRB and AC&A entered into the 2006 AC&A Trade Contract prior to Land Site's

work at Foxbank and that trade contract contained provisions that required AC&A to

maintain a CGL policy and add DRB to that policy as an additional insured.

> 6. DRB contracted with the following pertinent subcontractors who performed work on the Foxbank Subdivision[:] A.C. & A. Concrete Inc.[], BR's Clearing and Grading, Inc.[], Firm Foundations, Inc.[], Land Site Services, LLC[], Southern Atlantic Construction, LLC[], and Marcinak Construction Company.

> 7. As a pre-requisite to performing work on the Foxbank Subdivision, DRB required each of the aforementioned subcontractors to execute a copy of DRB's Trade Contract, all of which contained DRB's General Conditions DRB Form C-2 . . . ."

> . . .

> 11. DRB's General Conditions Form C-2, which was a part of the Trade Contracts DRB required each of its subcontractors to execute in order to perform work on Foxbank Subdivision required DRB's subcontractors to do the following, without limitation:

>> a. Maintain CGL insurance coverage, including completed operations coverage;

>> b. To insure DRB with primary coverage as an additional insured on the subcontractors' CGL insurance polies; and

>> c. To provide DRB with a certificate of insurance showing these coverages were in place prior to commencing work on the Foxbank Subdivision . . . ."

ECF No. 111-2, Woods Aff. ¶¶ 6–11. If such a trade contract between DRB and AC&A

existed, as Woods has testified, it would be sufficient to confer additional insured

coverage to DRB under the Main Street Policy. Explaining why DRB has not presented

such a trade contract as evidence in this matter, Woods testified that:

> 18. Over the years since work on the Foxbank Subdivision was completed, some records of Trade Contracts entered into between DRB and its subcontractors have been lost and/or are missing, despite DRB's extensive efforts to locate any and all records pertinent to this lawsuit and the [underlying lawsuit].

> 19. As a result, any and all records of Trade Contracts between DRB and the aforementioned subcontractors that are incomplete and/or are missing pages have simply been lost or are unable to be located.

Id. at ¶¶ 18–19.  Discussed above, the Main Street Policy requires the existence of a contract between DRB and AC&A under which AC&A was required to add DRB to the Main Street Policy as an additional insured; it does not require that DRB present such a contract to Main Street.  So long as a trade contract that meets the requirements of the Main Street Policy existed, as Woods has testified, DRB would be entitled to coverage as an additional insured to the policy.

Main Street has argued that Woods' testimony is inadmissible and cannot be considered by the court on summary judgment on three grounds.  First, Main Street argues that the courts consideration of Woods' testimony runs is barred by the Fed. R. Evid. 1004, the "best evidence rule."  The court's consideration of this evidence does not run afoul of the best evidence rule, which holds that secondary evidence, like testimony evidence, is admissible to prove the contents of a writing where "all the originals are lost or destroyed, and not by the proponent acting in bad faith."  Fed. R. Evid. 1004.  Here, there is no evidence that DRB acted in bad faith in losing the trade contracts it claims it had with its subcontractors.  Therefore, the court's consideration of the evidence is not barred by the best evidence rule, and the fact that DRB cannot produce those contracts goes to the weight of the evidence, not its admissibility.

Second, Main Street argues that Woods' testimony is not competent because it is not based on personal knowledge. Main Street bases this argument on the fact that Woods's testimony concerns a 2006 contract, and Woods was employed elsewhere in 2006. Viewing the evidence in a light most favorable to DRB, the court cannot reach this conclusion. Woods testified in his affidavit that he is "familiar with DRB's company practices, the details of the construction of the Foxbank Subdivision, and the subsequent litigation involving the Foxbank Subdivision." Woods Aff. ¶¶ 6–11. It is entirely possible that, although Woods was employed elsewhere during the contract's formation, he gained knowledge with the 2006 AC&A Trade Contract during his employment with DRB. To be sure, a witness does not need to have witnessed the execution of a contract in order to possess personal knowledge about that contract. The court therefore rejects this argument.

Finally, Main Street argues that that affidavit "was filed in violation of Fed. R. Civ. P. 6(c)(2) and should be stricken from the record." ECF No. 163. That rule states, "Any affidavit supporting a motion must be served with the motion." Fed. R. Civ. P. 6(c)(2). Main Street's problem is that DRB submitted Woods' affidavit in its response opposing Main Street's motion for summary judgment, and the court considers it with respect to Main Street's motion, not DRB's. Therefore, Woods' affidavit is not an "affidavit supporting a motion," and Rule 6(c)(2) is inapplicable. Therefore, the court rejects this argument and considers Woods' testimony.

In consideration thereof, the court finds that DRB has presented evidence that a valid written contract between it and AC&A existed that would extend additional insured coverage to DRB under the Main Street Policy. For these reasons, a genuine issue of

material fact underlies DRB's status as an additional insured to the Main Street Policy. As such, the court cannot grant summary judgment in favor of Main Street on DRB's declaratory judgment claim.

**B. Coverage Based on the Certificates of Insurance**

Because the court cannot determine whether a written contract existed to confer additional insured coverage to DRB under the Main Street Policy, it must now consider whether DRB is entitled to coverage by estoppel. DRB argues that the issuance of certificates of insurance, each of which espouses additional insured coverage, confers additional insured coverage to DRB because DRB reasonably relied on certificates' statements of coverage. In other words, DRB argues that the issuance of certificates of insurance estops Main Street from denying DRB additional insured coverage. The court disagrees.

A certificate of insurance is a "document acknowledging that an insurance policy has been written[] and setting forth in general terms what the policy covers." CERTIFICATE, Black's Law Dictionary (11th ed. 2019). Generally, courts treat certificates of insurance as mere evidence of insurance coverage rather than operative documents that establish coverage. The Supreme Court, applying Pennsylvania law, has held that the terms of an insurance policy control over a certificate of insurance, finding that "a certificate [of insurance] is not part of the contract of, or necessary to, the insurance." Boseman v. Connecticut Gen. Life Ins. Co., 301 U.S. 196, 203 (1937); see also 17 Couch on Ins. § 242:33, Loss Payee as Third-Party Beneficiary ("Where an entity requires another to procure insurance naming it an additional insured, that party should not rely on a mere certificate of insurance, but should insist on a copy of the policy. A

14

certificate of insurance is not part of the policy. . . .").  When in conflict, the terms of the policy, not the certificate, control.  See Taylor v. Kinsella, 742 F.2d 709, 711 (2d Cir. 1984).

The analysis becomes more complex, however, when the issue is whether a certificate of insurance confers coverage to a supposed additional insured who would not otherwise be covered under the policy.  South Carolina courts have not confronted the issue of whether certificates of insurance that espouse additional insured coverage are sufficient to confer coverage upon their holder by estoppel.  However, the general constructs of the doctrine of estoppel in South Carolina are instructive.

"In appropriate circumstances, estoppel can be used to prevent the insurer from denying coverage to the insured."  Stringer v. State Farm Mut. Auto. Ins. Co., 687 S.E.2d 58, 61 (S.C. Ct. App. 2009) (citing Koren v. Nat'l Home Life Assurance Co., 288 S.E.2d 392, 394 (S.C. 1982)).

> The essential elements of estoppel as related to the party estopped are: (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, the essential elements are: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question, (2) reliance upon the conduct of the party estopped, and (3) prejudicial change in position.

S. Dev. Land & Golf Co. v. S.C. Pub. Serv. Auth., 426 S.E.2d 748, 750 (S.C. 1993) (internal citations omitted).  Further, "the reliance by the party claiming estoppel must be reasonable, and it must proceed in good faith."  Provident Life & Acc. Ins. Co. v. Driver, 451 S.E.2d 924, 928 (S.C. Ct. App. 1994) (citing S. Dev. Land & Golf Co. v. S.C. Pub. Serv. Auth., 426 S.E.2d 748, 751 (S.C. 1993)).

Courts outside of South Carolina are split regarding whether an insurer can be estopped from denying coverage to a certificate holder where the certificate of insurance purports to extend additional insured coverage. Some courts have estopped insurers from denying coverage where a certificate of insurance identifies a third party as an additional insured . See Sumitomo Marine & Fire Ins. Co. of Am. v. S. Guar. Ins. Co. of Georgia, 337 F. Supp. 2d 1339 (N.D. Ga. 2004) (applying Georgia law); Blackburn, Nickels & Smith, Inc. v. Nat'l Farmers Union Prop. & Cas. Co., 482 N.W.2d 600, 604 (N.D. 1992) (applying North Dakota law); Marlin v. Wetzel Cty. Bd. of Educ., 569 S.E.2d 462, 472 (W. Va. 2002). Other courts have refused to apply estoppel to confer coverage upon a certificate holder. See Mulvey Const., Inc. v. Bituminous Cas. Corp., 571 F. App'x 150 (4th Cir. 2014) (applying Virginia law); Vinco Inc. v. Royal Ins. Co. of Am., 29 F. App'x 753 (2d Cir. 2002) (applying Connecticut law); TIG Ins. Co. v. Sedgwick James of Washington, 184 F. Supp. 2d 591 (S.D. Tex. 2001), aff'd, 276 F.3d 754 (5th Cir. 2002) (applying Texas law); G.E. Tignall & Co. v. Reliance Nat. Ins. Co., 102 F. Supp. 2d 300, 304 (D. Md. 2000) (applying Maryland law); Am. Country Ins. Co. v. Kraemer Bros., 699 N.E.2d 1056, 1060 (Ill. 1998).

Notably, the courts that refused to apply the doctrine of estoppel to extend coverage found that the supposed additional insureds' reliance on the certificates was not reasonable due to disclaimers printed on the certificates. See Mulvey Const., 571 F. App'x at 159 ("The certificates of insurance included [a] direct and specific disclaimer . . . . We, like the district court, must conclude that Virginia would not recognize the use of estoppel to change the policy in the circumstances of this case."); TIG Ins. Co., 184 F. Supp. 2d at 597–98 ("The certificate of insurance [] clearly states that the certificate is

issued 'as a matter of information only,' and that it does not purport to 'amend, extend, or alter' the terms of any insurance policies listed therein."); <u>Kraemer Bros.</u>, 699 N.E.2d at 1060 ("If [a] certificate includes a disclaimer, the insured may not rely on representations made in the certificate but must look to the policy itself to determine the scope of coverage.").

DRB has presented three certificates of insurance, which DRB claims AC&A provided to DRB to indicate that the Main Street Policy extended coverage to DRB as an additional insured. DRB contends that Wickliffe Insurance Services, who procured the Main Street Policy, issued these certificates of insurance to AC&A, who in turn provided them to DRB. Indeed, the certificates indicate that DRB is covered as an additional insured.[4] <u>See</u> ECF No. 56-4 at 29, 30, and 31. Importantly, though, the certificates all contain two explicit disclaimers, located at the top of each document in conspicuous script:

> THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.
>
> …

---

[4] Each of the three certificates of insurance that DRB has produced state that DRB is covered an additional insured to an insurance policy with the policy number MPO47044. This is not the Main Street Policy number. Further, each of the certificates lists the applicable insurer as "National Grange Mutual Ins. Co." ECF No. 56-4 at 29, 30, and 31. DRB contends that these discrepencies are merely "typographical errors" and that the certificates of insurance nevertheless entitle it to coverage under the Main Street Policy. The court need not resolve this factual issue, because even if the certificates did espouse coverage under the Main Street Policy, they do not entitle DRB to coverage.

> IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. . . . A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsements.

Id.

The court finds that these conspicuous disclaimers preclude a finding of estoppel because they render DRB's reliance upon the certificates of insurance unreasonable. Not only do the certificates indicate that they are issued as "matter[s] of information only", but they also give clear and specific notice to supposed additional insureds that the certificates "do[] not confer rights" without an endorsement to the policy. Further, the disclaimers appear in conspicuous font on the top of each certificate. The court cannot imagine that South Carolina law would stretch the doctrine of equitable estoppel so far as to cover reliance upon certificates with such clear and conspicuous disclaimers.

DRB relies upon two cases for its argument that the certificates of insurance confer coverage by estoppel: Sumitomo Marine & Fire Ins. Co. of Am. v. S. Guar. Ins. Co. of Georgia, 337 F. Supp. 2d 1339 (N.D. Ga. 2004) and Marlin v. Wetzel Cty. Bd. of Educ., 569 S.E.2d 462, 472 (W. Va. 2002). Because neither case analyzes the issue of the certificates' disclaimers, the court finds these cases unconvincing.

In Sumitomo, the court held that an insurer was estopped from denying coverage to a supposed additional insured where the insurer's agent issued the supposed additional insured certificates of insurance indicating that coverage existed. 337 F. Supp. 2d at 1355–56. The court reasoned that the insurer's agent had both actual and apparent authority from the insurer to issue the certificates and that the supposed additional insured reasonably relied thereon. The court reasoned that although a certificate of insurance is generally regarded as mere evidence of coverage, certificates in the

construction context are used by general contractors as evidence that they are covered under their subcontractor's CGL policy. Without a certificate, the court posited, a general contractor would not permit its subcontractor to perform work. Therefore, the court found the general contractor's reliance on a certificate of insurance reasonable.

> The court in <u>Marlin</u>, applying the same concepts to West Virginia law, stated:
>
> > a certificate of insurance is evidence of insurance coverage, and is not a separate and distinct contract for insurance. However, because a certificate of insurance is an insurance company's written representation that a policyholder has certain insurance coverage in effect at the time the certificate is issued, the insurance company may be estopped from later denying the existence of that coverage when the policyholder or the recipient of a certificate has reasonably relied to their detriment upon a misrepresentation in the certificate.

569 S.E.2d at 472–73. Neither of the cases on which DRB relies analyzed the issue of the certificates' disclaimers beyond a passing reference, <u>Sumitomo</u>, 337 F. Supp. 2d at 1355 (stating only, "[d]efendants then point out that the Certificates of Insurance also expressly included a disclaimer that they are for information purposes only and do not amend the respective policies of insurance. The parties have not submitted any binding authority squarely on point."), and this court cannot ascertain the nature or scope of the disclaimers that were present in those cases. As such, neither case gives the court reason to find that DRB's reliance on the certificates of insurance was reasonable in the face of the clear and conspicuous disclaimers printed upon each.

### C. Main Street's Failure to Provide DRB with the Policy

Additionally, DRB argues that Main Street cannot rely upon a policy provision to exclude it from coverage when it did not produce a copy of the policy to DRB. This argument is unconvincing, as are the cases DRB cites in support. DRB argues that "Main Street [] cannot rely upon policy exclusions when [the exclusions] have not been

communicated to [DRB]." ECF No. 161 at 13. As an initial matter, the court points out that the Main Street Policy does not exclude DRB from coverage by means of an exclusion to the policy. An exclusion is an area of coverage that the insurer removes from a policy that would otherwise be covered by the policy. See EXCLUSION, Black's Law Dictionary (11th ed. 2019). The Main Street Policy, conversely, never extended coverage to DRB in the first place. Thus, DRB's lack of insurance coverage is not the result of an exclusion. The cases on which DRB relies suffer from a similar fatal flaw and miss the mark.[5]

In each of the cases on which DRB relies, an insurer failed to provide a copy of the policy to its insured. Instead, the insured held a certificate of insurance. Under those circumstances those courts found that the certificates held by the insureds controlled over exclusions found in the policy, to which the insureds did not have access. The present circumstances are different. Here, the question is whether DRB is an insured, not whether a certain occurrence is covered or excluded under the policy. Further, unlike the plaintiffs in those cases, DRB's status as an insured is uncertain. It would make little sense for the court to hold that Main Street was required to provide a copy of the Main Street Policy to DRB, a third party who the court has not found is covered under the Main Street Policy. The doctrine employed by these cases is plainly inapplicable to the case at hand. Therefore, the court rejects this argument.

---

[5] In support of its argument, DRB cites to: Brown Mach. Works & Supply Co. v. Ins. Co. of N. Am., 659 So. 2d 51, 56 (Ala. 1995); Moore v. Energy Mut. Ins. Co., 814 P.2d 1141, 1144 (Utah Ct. App. 1991); and J. M. Corbett Co. v. Ins. Co. of N. Am., 357 N.E.2d 125, 128 (Ill. App. 1976). Because each case suffers from the same fatal flaw, the court discusses them together.

In sum, the court cannot grant summary judgment to either party on DRB's declaratory judgment claim. Summary judgment is not warranted on behalf of Main Street because whether DRB is entitled to coverage as an additional insured to the Main Street Policy depends on disputed issues of material fact. DRB is not entitled to summary judgement for the same reason, and because its alternative estoppel argument fails. As such, DRB's declaratory judgment claim as to Main Street's duty to defend and indemnify DRB in the underlying suit survives and proceeds to trial.

## D. DRB's Remaining Claims

Having resolved the legal issues put before it, the court must now determine the practical effect of its findings. By way of clarification, DRB and Main Street have both filed motions for summary judgment. DRB's motion requests summary judgment solely on its declaratory judgment claim, which asks the court to find that Main Street has a duty to defend and indemnify DRB in the underlying lawsuit. Main Street's motion, on the other hand, asks the court to grant summary judgment "on all claims asserted by [DRB] against Main Street in this action." ECF No. 143 at 1. Despite posturing its motion as one for summary judgment on all of DRB's claims, Main Street only makes substantive arguments with respect to DRB's declaratory judgment claim, regarding Main Street's alleged duty to defend. Main Street does not specifically request summary judgment on DRB's other claims for bad faith, indemnification, or promissory estoppel. Nor does Main Street's motion explicitly address these claims.

However, this order's analysis into DRB's declaratory judgment claim has required the court to determine issues that are part and parcel to DRB's promissory estoppel claim. Specifically, this order has found that Frankenmuth is not estopped from

denying coverage to DRB because DRB's reliance on the certificates of insurance was unreasonable as a matter of law. This finding goes to the very heart of DRB's promissory estoppel claim. "The elements of promissory estoppel are (1) an unambiguous promise by the promisor; (2) reasonable reliance on the promise by the promisee; (3) reliance by the promisee was expected by and foreseeable to the promisor; and (4) injury caused to the promisee by his reasonable reliance." N. Am. Rescue Prod., Inc. v. Richardson, 769 S.E.2d 237, 241 (S.C. 2015) (citing Davis v. Greenwood Sch. Dist. 50, 634, 620 S.E.2d 65, 67 (S.C. 2005)). DRB's claim for promissory estoppel cannot stand because this order finds that its reliance on the certificates of insurance was not reasonable. Therefore, the court's finding renders the claim untenable.

Next, the court turns to DRB's bad faith claim. "The elements of a bad faith refusal to pay action are (1) the existence of a contract of insurance between the parties; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action; and (4) causing damage to the insured." Crossley v. State Farm Mut. Auto. Ins. Co., 415 S.E.2d 393, 396–97 (S.C. 1992). "But if there is a reasonable ground for contesting a claim, there is no bad faith." Helena Chem. Co. v. Allianz Underwriters Ins. Co., 594 S.E.2d 455, 462 (S.C. 2004) (quoting Crossley v. State Farm Mut. Auto. Ins. Co., 415 S.E.2d 393, 397 (S.C. 1992) (internal quotation marks omitted). DRB has admitted that it has lost some of the documents that it claims would otherwise establish coverage in this case. Although the Main Street policy does not require DRB to present a contract to prove it is entitled to additional insured coverage, it would make little sense to hold that Main Street's denial of coverage, in the absence of such a contract, was unreasonable. Based on that fact and the lengthy analysis

above, Main Street had reasonable grounds for its conclusion that DRB was not an additional insured under the Main Street Policy. Therefore, DRB's claim for bad faith must fail.

As such, the court finds itself at a procedural fork in the road[6] and must choose between the lesser of two evils. The court must either grant summary judgment on DRB's claims of bad faith and promissory estoppel in favor of a party who did not explicitly request it or deny summary judgment and send legally untenable claims to a jury. The court determines that the latter is the greater evil, so it proceeds with the former. Thus, because the court's findings necessitate it, the court grants summary judgment in favor of Main Street with respect to DRB's claims for promissory estoppel and bad faith.

The same cannot be said for DRB's remaining claim for indemnification / contribution. Although the court is unsure of the nature or validity of the indemnification DRB seeks—be it contractual or equitable—the court is unwilling to grant summary judgment on a claim that may be viable in favor of a party who has not explicitly requested it. Without such a request or findings that necessitate summary judgment, the court declines to consider DRB's claim for indemnification / contribution at present and denies Frankenmuth's motion for summary judgment with respect to the same.

In sum, after the court's resolution of the instant motions, DRB's declaratory judgment and indemnification / contribution claim survive and will proceed to trial;

---

[6] As the sagacious Yogi Berra once said, "When you come to a fork in the road, take it."

DRB's bad faith and promissory estoppel causes of action are resolved on summary judgment in favor of Main Street.

## IV.   CONCLUSION

For the foregoing reasons the court **DENIES** plaintiffs' motion for summary judgment and **GRANTS IN PART** defendant's motion with respect to plaintiffs' second and fourth causes of action and **DENIES IN PART** defendant's motion with respect to plaintiffs' first and third causes of action.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**April 3, 2020**
**Charleston, South Carolina**