**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| DAN RYAN BUILDERS WEST VIRGINIA, LLC, *f/k/a* DAN RYAN BUILDERS INC. and DAN RYAN BUILDERS SOUTH CAROLINA, LLC, | ) ) ) ) ) | |
| | ) | No. 2:18-cv-00589-DCN |
| Plaintiffs, | ) ) | |
| | ) | **ORDER** |
| vs. | ) ) | |
| MAIN STREET AMERICA ASSURANCE COMPANY, SELECTIVE INSURANCE GROUP, INC., THE CINCINNATI INSURANCE COMPANY, FRANKENMUTH MUTUAL INSURANCE CO., STATE AUTOMOBILE MUTUAL INSURANCE COMPANY, PENNSYLVANIA NATIONAL SECURITY INSURANCE COMPANY, and PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

     This matter is before the court on plaintiffs Dan Ryan Builders West Virginia, LLC and Dan Ryan Builders South Carolina, LLC's (collectively, "DRB") motion for partial summary judgment, ECF No. 57, and defendant Selective Insurance Group Inc.'s ("Selective") motion for summary judgment, ECF No. 138. For the reasons set forth below, the court denies DRB's motion for partial summary judgment and grants in part and denies in part Selective's motion for summary judgment.

## I.  BACKGROUND

     This insurance dispute arises from a construction project managed by DRB, a construction company that primarily builds new homes. DRB secured a contract to

construct new homes in a community known as the Foxbank Subdivision in Berkeley County, South Carolina ("Foxbank" or the "Foxbank Subdivision"). In order to perform this contract, DRB hired various subcontractors. The defendants in this case are insurers of those subcontractors. Relevant to the instant motions, Selective is the insurer of BR's Grading & Clearing, Inc. ("BR's"), one of DRB's subcontractors. B.R.'s maintained a commercial general liability ("CGL") policy with Selective (the "Selective Policy") during the time that it allegedly performed work for DRB on Foxbank.

On April 24, 2014, two Foxbank Subdivision homeowners filed suit against DRB in the Court of Common Pleas for Berkeley County, South Carolina (the "Dickerson Lawsuit"). The Dickerson Lawsuit is a class action on behalf of other similarly situated owners of homes that were built by DRB. The lawsuit alleges property damage, such as "slabs and building components moving and/or cracking . . repeatedly and/or continuously and continu[ing] to occur causing damage to building components, the finish and structural elements of the home[s]." ECF No. 54-1 at 9. On March 22, 2017, more Foxbank homeowners filed a second action against DRB and several subcontractors, alleging similar harms as in the Dickerson Lawsuit (the "Tipton Lawsuit"). The two lawsuits have been consolidated in state court (the "underlying lawsuit").

On or around November 27, 2013, after it received claims from the Foxbank Subdivision homeowners but before the homeowners filed suit, DRB notified BR's and BB&T Insurance of the claims and tendered a demand for defense and indemnity. In a February 12, 2014 letter, Selective denied DRB's demand for defense and indemnity. On December 24, 2014, after DRB notified Selective that the Foxbank homeowners had filed

the Dickerson lawsuit, Selective sent DRB a letter again denying defense and indemnity. Finally, on December 7, 2017, DRB demanded defense and indemnity from Selective with respect to the recently filed Tipton lawsuit, to which Selective did not provide a response. To date, Selective has not provided a defense or indemnity to DRB in the underlying suit.

On March 1, 2018, DRB filed this lawsuit against the insurers of the subcontractors who allegedly performed work on the Foxbank project, seeking a declaratory judgment that the underlying lawsuits set forth claims that are covered under each of defendant's CGL policies and that defendants have a duty to defend and indemnify DRB in these underlying lawsuits. DRB also brought claims for bad faith refusal to pay first party benefits and for indemnification / contribution. On September 27, 2018, DRB filed an amended complaint, adding a fourth cause of action for promissory estoppel, arguing that defendants allowed certificates of insurance to be issued to DRB upon which DRB reasonably relied.

On October 3 and 26, 2018, DRB filed motions for partial summary judgment against all insurer-defendants, asking the court to declare that it is entitled to coverage. ECF Nos. 54, 55, 56, 57, 74, and 75, respectively. Each of the insurer-defendants have since also filed motions for summary judgment. ECF Nos. 118, 135, 138, 139, 140, and 143. The court held a hearing on DRB's motions on January 8, 2019 and a hearing on the defendants' motions on August 8, 2019. In all, twelve summary judgment motions await the court's resolution.

This order resolves two of those motions. On October 3, 2018, DRB filed a motion for partial summary judgment on its declaratory judgment claim against Selective.

ECF No. 57.  On October 31, 2018, Selective responded, ECF No. 77, and on December

12, 2018, DRB replied, ECF No. 110.  On June 10, 2019, Selective filed a cross-motion

for summary judgment on all of DRB's claims against it.  ECF No. 138.  DRB responded

on June 20, 2019, ECF No. 151, and Selective filed a reply on June 27, 2019, ECF No.

155.  Thus, this matter is ripe for the court's review.

## II.  STANDARD

Summary judgment shall be granted "if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine dispute as to

any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(c).  Rule 56(c) of the Federal Rules of Civil Procedure requires that the district

court enter judgment against a party who, "'after adequate time for discovery . . . fails to

make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial.'"  Stone v. Liberty

Mut. Ins. Co., 105 F.3d 188, 190 (4th Cir. 1997) (quoting Celotex Corp. v. Catrett, 477

U.S. 317, 322 (1986)).  "[T]his standard provides that the mere existence of some alleged

factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment; the requirement is that there be no genuine issue of

material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  "Only

disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment."  Id. at 248.  "[S]ummary judgment

will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party."  Id.

"[A]t the summary judgment stage the judge's function is not himself to weigh

the evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial." Id. at 249. When the party moving for summary judgment does

not bear the ultimate burden of persuasion at trial, it may discharge its burden by

demonstrating to the court that there is an absence of evidence to support the non-moving

party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The non-movant must

then "make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

Any reasonable inferences are to be drawn in favor of the nonmoving party.

Anderson, 477 U.S. at 255, Webster v. U.S. Dep't of Agric., 685 F.3d 411, 421 (4th Cir.

2012). However, to defeat summary judgment, the nonmoving party must rely on more

than conclusory allegations, mere speculation, the building of one inference upon

another, or the mere existence of a scintilla of evidence. See Anderson, 477 U.S. at 252;

Stone, 105 F.3d at 191. Rather, "a party opposing a properly supported motion for

summary judgment . . . must 'set forth specific facts showing that there is a genuine issue

for trial.'" Bouchat, 346 F.3d at 522 (quoting Fed. R. Civ. P. 56(e) (2002) (amended

2010)). If the adverse party fails to provide evidence establishing that the fact finder

could reasonably decide in his favor, then summary judgment shall be entered "regardless

of '[a]ny proof or evidentiary requirements imposed by the substantive law.'" Id.

(quoting Anderson, 477 U.S. at 248).

### III. DISCUSSION

At the outset, the court wishes to clarify a matter of insurance law. It is well-

settled in South Carolina that a liability insurer has a duty to defend its insured in a suit

that alleges harms payable under the terms of the policy.  B.L.G. Enterprises, Inc. v. First Fin. Ins. Co., 514 S.E.2d 327, 330 (S.C. 1999) (citing Sloan Constr. Co. v. Central Nat'l Ins. Co. of Omaha, 236 S.E.2d 818 (S.C. 1977)).  It is also well-settled South Carolina law that where the underlying complaint against an insured creates even the possibility of coverage, the insurer is obligated to defend.  Union Ins. Co. v. Soleil Grp., Inc., 465 F. Supp. 2d 567, 572 (D.S.C. 2006) (quoting Isle of Palms Pest Control Co. v. Monticello Ins. Co., 459 S.E.2d 318, 319 (S.C. Ct. App. 1994)).

DRB and Selective both cite to these cases, among others,[1] in arguing for and against the existence of a duty to defend in this case.  However, the law established by or applied in those cases, while at best instructive, is not directly on point.  In each of those cases, there was no dispute that the plaintiff was an insured.  The issue before those courts was whether some occurrence was covered by the policy between the undisputed insurer and insured.  The issue here is different.  To determine whether Selective owes a duty to defend DRB in the underlying suit, the court must first determine whether DRB was an insured with respect to the Selective Policy at all.  In South Carolina, a party seeking coverage has the burden to show that it is an insured.  State Farm Mut. Auto. Ins. Co. v. Logan, 444 F. Supp. 2d 622, 626 (D.S.C. 2006) (citing United States Fire Ins. Co. v. Macloskie, 465 S.E.2d 759, 760 (S.C. 1996)).[2]  Therefore, the court must first analyze

_____

[1] DRB also relies upon USAA Prop. & Cas. Ins. Co. v. Clegg, 661 S.E.2d 791 (S.C. 2008); Gordon-Gallup Realtors, Inc. v. Cincinnati Ins. Co., 265 S.E.2d 38, 39 (S.C. 1980); and C.D. Walters Const. Co. v. Fireman's Ins. Co. of Newark, New Jersey, 316 S.E.2d 709 (S.C. Ct. App. 1984).  None of these cases are directly on point.
[2] Both of these cases dealt with a party's burden to prove that it was covered under an insurance policy's "omnibus clause" as an additional insured, finding that the burden fell on the party seeking coverage.  Because an omnibus clause affords a third party to the insurance contract coverage in some circumstances, it is akin to the

whether DRB is an insured with respect to the Selective Policy before it considers whether the underlying lawsuit is covered under the Selective Policy. Finding that the first question depends on issues of disputed fact, the court need not reach the second.

In its motion for partial summary judgment, DRB argues that Selective has a duty to defend DRB in the underlying lawsuit on two alternative grounds. First, it argues that the terms of the Selective Policy extend coverage to DRB as an "additional insured" to the policy under "Endorsement CG 79 21 01 10" (the "Additional Insured Endorsement"). In the alternative, DRB argues that the issuance of several certificates of insurance by Selective's insurance agent conferred upon it "additional insured" coverage by estoppel, irrespective of the terms of the Selective Policy.[3] In its cross motion for summary judgment, Selective argues that the terms of the Selective Policy do not extend coverage to DRB based on the relevant contracts and that the claims alleged in the underlying lawsuit are excluded from coverage by the Selective Policy's "professional service" exclusion. Therefore, Selective argues, it has no duty to defend DRB in the underlying lawsuit. Because whether DRB is entitled to coverage under the Selective Policy depends on genuine issues of disputed fact, summary judgment is inappropriate on DRB's declaratory judgment claim. However, for the following reasons, the court grants

---

Additional Insured Endorsement in the Selective Policy. Therefore, the court finds these cases persuasive and directly applicable to the current dispute.

[3] In its response brief to DRB's summary judgment motion, Selective incorporates "all other legal positions, factual disputes, and arguments of the similarly situated co-defendants . . . ." ECF No. 77 at 1. To the extent that the court does not address an argument that Selective incorporates but does not explicitly make in its briefs, the court incorporates its rulings from its orders on the summary judgment motions of Selective's similarly situated co-defendants and applies those findings with equal force to Selective.

summary judgment in favor of Selective on DRB's promissory estoppel and bad faith claims.

### A. Coverage Under the Selective Policy

"An insurance policy is a contract between the insured and the insurance company, and the terms of the policy are to be construed according to contract law." Auto Owners Ins. Co. v. Rollison, 663 S.E.2d 484, 487 (S.C. 2008). "The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." Beaufort Cty. Sch. Dist. v. United Nat'l Ins. Co., 709 S.E.2d 85, 90 (S.C. Ct. App. 2011) (citing Schulmeyer v. State Farm Fire & Cas. Co., 579 S.E.2d 132, 134 (S.C. 2003)). "If the contract's language is clear and unambiguous, the language alone, understood in its plain, ordinary, and popular sense, determines the contract's force and effect." Id. (citing Schulmeyer, 579 S.E.2d at 134). However, an insurance contract which is "in any respect ambiguous or capable of two meanings" must be construed strictly against its drafter, the insurer. Reynolds v. Wabash Life Ins. Co., 161 S.E.2d 168, 169 (S.C. 1968)).

As the basis of its declaratory judgment claim, DRB argues that it is entitled to coverage under the terms of the Selective Policy. Although the Selective Policy is an insurance policy between Selective and its primary insured, BR's, DRB claims it is entitled to coverage as an "additional insured" under the policy's Additional Insured Endorsement. The endorsement states:

> **Section II – Who Is An Insured** is amended to include as an additional insured any person or organization whom [BR's has] agreed in a written contract or written agreement to add as an additional insured on [the] policy. Such person or organization is an additional insured only with respect to liability for "bodily injury" or "property damage" caused, in whole or in

> part, by "your work" performed for that additional insured and included in the "products-completed operations hazard."

ECF No. 57-6 at 176 (emphasis in original).

Stated less enigmatically, the Selective Policy only extends additional insured coverage to DRB if (1) a written contract existed between DRB and BR's (2) that required BR's to add DRB as an additional insured to the Selective Policy. DRB relies on three trade contracts between it and BR's to satisfy this requirement: one dated January 1, 2008 (the "2008 BR's Trade Contract"), one dated September 1, 2010 (the "2010 BR's Trade Contract"), and one dated April 1, 2013 (the "2013 BR's Trade Contract"). Each contract is written and signed by both BR's and DRB and thus is enforceable. Because genuine issues of material fact exist with respect to each, however, DRB is not entitled to judgment as a matter of law. The court discusses the 2008 and 2013 BR's Trade Contracts first because similar factual issues underlie each, and then it discusses the 2010 BR's Trade Contract.

DRB argues that the 2008 BR's Trade Contract satisfies the terms of the Selective Policy and entitles it to additional insured coverage as a matter of law. The parties do not dispute that the 2008 BR's Trade Contract includes General Conditions Form C-2, which includes a provision that required BR's to add DRB as an additional insured to BR's primary insurance policy.

> (c) The insurance maintained by [BR's] additionally shall comply with the following requirements:
>
> 1. [DRB] shall be added as an Additional Insured on General Liability, Auto Liability and Umbrella policies. Additional insured coverage is required to be per ISO CG2010 11/85 or its equivalent (including completed operations) and coverage is to be on a Primary basis.

ECF No. 57-5 at 55.

In response, Selective argues that the 2008 Trade Contract does not satisfy the terms of the policy because it was only in effect from 2008 to 2010 and the Selective Policy period began in 2013. Indeed, the Selective Policy states that was in effect between January 30, 2013 and January 30, 2014. The 2008 BR's Trade Contract, however, contains a "term" provision which states that the contract "shall automatically extend for additional periods of one (1) year, unless either party gives the other written notice of the termination at least thirty (30) days prior to the then current Expiration Date." ECF No. 57-5 at 46. As DRB correctly points out, "Selective has not produced any evidence[] that the 2008 [BR's] Trade Contract was terminated." ECF No. 151 at 16. Likewise, DRB has produced no evidence that the 2008 BR's Trade Contract remained in effect when the Selective Policy period began. Based on the lack of evidence, the court cannot conclude whether the 2008 BR's Trade Contract was in effect during the Selective Policy period. Therefore, the 2008 BR's Trade Contract does not entitle DRB to coverage as a matter of law.

The court now turns to the 2013 BR's Trade Contract. Selective argues that just as the 2008 BR's Trade Contract arrived too early, the 2013 BR's Trade Contract arrived too late. Like the 2008 BR's Trade Contract, the 2013 BR's Trade Contract includes General Conditions Form C-2, which required BR's to add DRB as an additional insured to its primary insurance policy. However, the 2013 BR's Trade Contract does not satisfy the terms of the Selective Policy, Selective argues, because the contract was executed in 2013 and BR's completed its work at Foxbank in 2012. Selective claims that BR's must have completed its work at Foxbank before 2013 "based on the certificates of

occupancy." ECF No. 138 at 9.[4]  DRB has presented evidence that BR's submitted invoices for work performed at Foxbank as late as February of 2013.  However, because the 2013 BR's Trade Contract was not executed by the parties until April 1, 2013, neither party has produced evidence that conclusively determines whether BR's was performing at work at Foxbank past April 1, 2013, when the 2013 BR's Trade Contract went into effect.  Therefore, whether the 2013 BR's Trade Contract satisfies the Selective Policy and entitles DRB to additional insurance coverage depends on genuine issues of material fact that preclude summary judgment.

Additionally, DRB relies on the 2010 BR's Trade Contract to satisfy the terms of the Selective Policy.  Unlike the 2008 and 2013 BR's Trade Contracts, the parties do not dispute that the 2010 BR's Trade Contract was in effect during the Selective Policy period and during a time in which BR's performed work on Foxbank.  Also unlike the other trade contracts, DRB has not produced the general conditions that it alleges were attached to the 2010 BR's Trade Contract.  As a result, the 2010 BR's Trade Contract does not include terms that would require BR to add DRB as an additional insured to its

---

[4] Although it does not provide the court with any evidence or even explain the logic behind its claim, the court assumes that Selective is asserting an argument similar to the one made by its co-defendant Main Street, who argued that its insured-subcontractor completed its work prior to the execution of its trade contract with DRB.  See ECF No. 161 at 26.  According to Main Street, the certificates of occupancy show that its insured-subcontractor had completed its work by 2013 because the final house in Foxbank was issued a certificate of occupancy on January 17, 2014 and the subcontractor was involved in the very early stages of construction.  It would be nearly impossible, Main Street argues, for a house to be issued a certificate of occupancy less than a year after its foundational work was completed.  Because BR's was also involved in the early stages of construction at Fxobank, the court recognizes that Main Street's argument could apply with equal force to Selective.  Even if the court chose not to consider this argument with respect to Selective, however, there is still insufficient evidence in the record for the court to grant summary judgment on the issue.

primary insurance policy. In the absence of such a provision, the 2010 BR's Trade Contract does not satisfy the terms of the Selective Policy and does not entitle DRB to coverage under the same.

However, the fact that DRB has not produced the general conditions does not foreclose the possibility that it is entitled to coverage under the 2010 BR's Trade Contract. DRB explains that "[its] records are missing a copy of the General Conditions Form C-2 . . . that was part of the 2010 Trade Contract." ECF No. 151 at 17. However, DRB has presented evidence that general conditions were attached to the 2010 BR's Trade Contract and that those general conditions included a provision that required BR's to add DRB as an additional insured to the Selective Policy. First, DRB points out that the 2010 BR's Trade Contract explicitly states that it includes "DRB General Conditions" as an incorporated attachment. ECF No. 57-5 at 37. While this provision demonstrates that some general conditions were attached to the 2010 BR's Trade Contract, it does not conclusively establish that the general conditions attached were the same as the general conditions attached to the 2008 and 2013 BR's Trade Contracts or that they necessarily included a provision that required BR to add DRB as an additional insured to the Selective Policy.

DRB has also presented the testimony of Edwin Woods, its South Region President, that DRB and BR's entered into a trade contract prior to BR's work at Foxbank and that the trade contract included General Conditions Form C-2. According to Woods, those general conditions contained provisions that required BR's to maintain a CGL policy and add DRB to that policy as an additional insured.

> 6. DRB contracted with the following pertinent subcontractors who performed work on the Foxbank Subdivision[:] A.C. & A. Concrete Inc.[],

BR's Clearing and Grading, Inc.[], Firm Foundations, Inc.[], Land Site Services, LLC[], Southern Atlantic Construction, LLC[], and Marcinak Construction Company.

7. As a prerequisite to performing work on the Foxbank Subdivision, DRB required each of the aforementioned subcontractors to execute a copy of DRB's Trade Contract, all of which contained DRB's General Conditions DRB Form C-2 . . . ."

. . .

11. DRB's General Conditions Form C-2, which was a part of the Trade Contracts DRB required each of its subcontractors to execute in order to perform work on Foxbank Subdivision required DRB's subcontractors to do the following, without limitation:

a. Maintain CGL insurance coverage, including completed operations coverage;

b. To insure DRB with primary coverage as an additional insured on the subcontractors' CGL insurance polies; and

c. To provide DRB with a certificate of insurance showing these coverages were in place prior to commencing work on the Foxbank Subdivision . . . ."

ECF No. 110-3, Woods Aff. ¶¶ 6–11. If such general conditions were attached to the 2010 BR's Trade Contract, the contract would be sufficient to confer additional insured coverage to DRB under the Selective Policy.

In light of this evidence and DRB's failure to produce the general conditions that it alleges required BR's to add DRB as an additional insured to the Selective Policy, the court concludes that the 2010 BR's Trade Contract does not entitle DRB to coverage as a matter of law, but it does create a genuine issue of material fact as to whether DRB was entitled to additional insured coverage. For these reasons, a genuine issue of material fact underlies DRB's status as an additional insured to the Selective Policy, and summary judgment is inappropriate.

## B. Coverage Based on the Certificates of Insurance

Because the court cannot determine whether a written contract existed to confer additional insured coverage to DRB under the Selective Policy, it must now consider whether DRB is entitled to coverage by estoppel. DRB argues that the issuance of certificates of insurance, each of which espouses additional insured coverage, confers additional insured coverage to DRB because DRB reasonably relied on certificates' statements of coverage. In other words, DRB argues that the issuance of certificates of insurance estops Selective from denying DRB additional insured coverage. The court disagrees.

A certificate of insurance is a "document acknowledging that an insurance policy has been written[] and setting forth in general terms what the policy covers." CERTIFICATE, Black's Law Dictionary (11th ed. 2019). Generally, courts treat certificates of insurance as mere evidence of insurance coverage rather than operative documents that establish coverage. The Supreme Court, applying Pennsylvania law, has held that the terms of an insurance policy control over a certificate of insurance, finding that "a certificate [of insurance] is not part of the contract of, or necessary to, the insurance." Boseman v. Connecticut Gen. Life Ins. Co., 301 U.S. 196, 203 (1937); see also 17 Couch on Ins. § 242:33, Loss Payee as Third-Party Beneficiary ("Where an entity requires another to procure insurance naming it an additional insured, that party should not rely on a mere certificate of insurance, but should insist on a copy of the policy. A certificate of insurance is not part of the policy. . . ."). When in conflict, the terms of the policy, not the certificate, control. See Taylor v. Kinsella, 742 F.2d 709, 711 (2d Cir. 1984).

The analysis becomes more complex, however, when the issue is whether a certificate of insurance confers coverage to a supposed additional insured who would not otherwise be covered under the policy. South Carolina courts have not confronted the issue of whether certificates of insurance that espouse additional insured coverage are sufficient to confer coverage upon their holder by estoppel. However, the general constructs of the doctrine of estoppel in South Carolina are instructive.

"In appropriate circumstances, estoppel can be used to prevent the insurer from denying coverage to the insured." Stringer v. State Farm Mut. Auto. Ins. Co., 687 S.E.2d 58, 61 (S.C. Ct. App. 2009) (citing Koren v. Nat'l Home Life Assurance Co., 288 S.E.2d 392, 394 (S.C. 1982)).

> The essential elements of estoppel as related to the party estopped are: (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, the essential elements are: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question, (2) reliance upon the conduct of the party estopped, and (3) prejudicial change in position.

S. Dev. Land & Golf Co. v. S.C. Pub. Serv. Auth., 426 S.E.2d 748, 750 (S.C. 1993) (internal citations omitted). Further, "the reliance by the party claiming estoppel must be reasonable, and it must proceed in good faith." Provident Life & Acc. Ins. Co. v. Driver, 451 S.E.2d 924, 928 (S.C. Ct. App. 1994) (citing S. Dev. Land & Golf Co. v. S.C. Pub. Serv. Auth., 426 S.E.2d 748, 751 (S.C. 1993)).

Courts outside of South Carolina are split regarding whether an insurer can be estopped from denying coverage to a certificate holder where the certificate of insurance purports to extend additional insured coverage. Some courts have estopped insurers from

denying coverage where a certificate of insurance identifies a third party as an additional insured . See Sumitomo Marine & Fire Ins. Co. of Am. v. S. Guar. Ins. Co. of Georgia, 337 F. Supp. 2d 1339 (N.D. Ga. 2004) (applying Georgia law); Blackburn, Nickels & Smith, Inc. v. Nat'l Farmers Union Prop. & Cas. Co., 482 N.W.2d 600, 604 (N.D. 1992) (applying North Dakota law); Marlin v. Wetzel Cty. Bd. of Educ., 569 S.E.2d 462, 472 (W. Va. 2002). Other courts have refused to apply estoppel to confer coverage upon a certificate holder. See Mulvey Const., Inc. v. Bituminous Cas. Corp., 571 F. App'x 150 (4th Cir. 2014) (applying Virginia law); Vinco Inc. v. Royal Ins. Co. of Am., 29 F. App'x 753 (2d Cir. 2002) (applying Connecticut law); TIG Ins. Co. v. Sedgwick James of Washington, 184 F. Supp. 2d 591 (S.D. Tex. 2001), aff'd, 276 F.3d 754 (5th Cir. 2002) (applying Texas law); G.E. Tignall & Co. v. Reliance Nat. Ins. Co., 102 F. Supp. 2d 300, 304 (D. Md. 2000) (applying Maryland law); Am. Country Ins. Co. v. Kraemer Bros., 699 N.E.2d 1056, 1060 (Ill. 1998).

Notably, the courts that refused to apply the doctrine of estoppel to extend coverage found that the supposed additional insureds' reliance on the certificates was not reasonable due to disclaimers printed on the certificates. See Mulvey Const., 571 F. App'x at 159 ("The certificates of insurance included [a] direct and specific disclaimer . . . . We, like the district court, must conclude that Virginia would not recognize the use of estoppel to change the policy in the circumstances of this case."); TIG Ins. Co., 184 F. Supp. 2d at 597–98 ("The certificate of insurance [] clearly states that the certificate is issued 'as a matter of information only,' and that it does not purport to 'amend, extend, or alter' the terms of any insurance policies listed therein."); Kraemer Bros., 699 N.E.2d at 1060 ("If [a] certificate includes a disclaimer, the insured may not rely on representations

made in the certificate but must look to the policy itself to determine the scope of coverage.").

DRB has presented two certificates of insurance, which DRB claims BR's provided to DRB to indicate that the Selective Policy extended coverage to DRB as an additional insured. DRB contends that BR's insurance agent, BB&T – Boyle Vaughan Insurance, issued these certificates of insurance to BR's, who in turn provided them to DRB.[5] Indeed, the certificates indicate that DRB is covered as an additional insured. See ECF No. 57-7. Importantly, though, the certificates all contain two explicit disclaimers, located at the top of each document in conspicuous script:

> THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.
>
> …
>
> IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. . . . A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsements.

Id. at 1 and 2.

The court finds that these conspicuous disclaimers preclude a finding of estoppel because they render DRB's reliance upon the certificates of insurance unreasonable. Not

---

[5] The parties dispute whether Boyle Vaughan Insurance is an agent of Selective, such that its actions would be attributable to Selective. However, the court declines to address this issue because even assuming arguendo that Boyle Vaughan Insurance is an agent of Selective, the court still finds that the issuance of the certificates of insurance do not confer coverage to DRB, as discussed in detail below.

only do the certificates indicate that they are issued as "matter[s] of information only", but they also give clear and specific notice to supposed additional insureds that the certificates "do[] not confer rights" without an endorsement to the policy. Further, the disclaimers appear in conspicuous font on the top of each certificate. The court cannot imagine that South Carolina law would stretch the doctrine of equitable estoppel so far as to cover reliance upon certificates with such clear and conspicuous disclaimers.

DRB relies upon two cases for its argument that the certificates of insurance confer coverage by estoppel: Sumitomo Marine & Fire Ins. Co. of Am. v. S. Guar. Ins. Co. of Georgia, 337 F. Supp. 2d 1339 (N.D. Ga. 2004) and Marlin v. Wetzel Cty. Bd. of Educ., 569 S.E.2d 462, 472 (W. Va. 2002). Because neither case analyzes the issue of the certificates' disclaimers, the court finds these cases unconvincing.

In Sumitomo, the court held that an insurer was estopped from denying coverage to a supposed additional insured where the insurer's agent issued the supposed additional insured certificates of insurance indicating that coverage existed. 337 F. Supp. 2d at 1355–56. The court reasoned that the insurer's agent had both actual and apparent authority from the insurer to issue the certificates and that the supposed additional insured reasonably relied thereon. The court reasoned that although a certificate of insurance is generally regarded as mere evidence of coverage, certificates in the construction context are used by general contractors as evidence that they are covered under their subcontractor's CGL policy. Without a certificate, the court posited, a general contractor would not permit its subcontractor to perform work. Therefore, the court found the general contractor's reliance on a certificate of insurance reasonable.

The court in Marlin, applying the same concepts to West Virginia law, stated:

> a certificate of insurance is evidence of insurance coverage, and is not a
> separate and distinct contract for insurance. However, because a certificate
> of insurance is an insurance company's written representation that a
> policyholder has certain insurance coverage in effect at the time the
> certificate is issued, the insurance company may be estopped from later
> denying the existence of that coverage when the policyholder or the
> recipient of a certificate has reasonably relied to their detriment upon a
> misrepresentation in the certificate.

569 S.E.2d at 472–73. Neither of the cases on which DRB relies analyzed the issue of
the certificates' disclaimers beyond a passing reference, Sumitomo, 337 F. Supp. 2d at
1355 (stating only, "[d]efendants then point out that the Certificates of Insurance also
expressly included a disclaimer that they are for information purposes only and do not
amend the respective policies of insurance. The parties have not submitted any binding
authority squarely on point."), and this court cannot ascertain the nature or scope of the
disclaimers that were present in those cases. As such, neither case gives the court reason
to find that DRB's reliance on the certificates of insurance was reasonable in the face of
the clear and conspicuous disclaimers printed upon each. Therefore, the court finds that
the certificates of insurance did not confer additional insured coverage to DRB through
estoppel.

### C. The "Professional Services" Exclusion

As its last argument for summary judgment, Selective contends that even if DRB
is an additional insured under the Selective Policy, Selective has no duty to defend DRB
in the underlying lawsuit because the claims contained therein are excluded from
coverage under the Selective Policy's "professional services exclusion." This argument
is without merit.

In South Carolina, "[i]nsurance policy exclusions are construed most strongly
against the insurance company, which also bears the burden of establishing the

exclusion's applicability."  <u>Owners Ins. Co. v. Clayton</u>, 614 S.E.2d 611, 614 (S.C. 2005)

(citing <u>Boggs v. Aetna Cas. & Sur. Co.</u>, 252 S.E.2d 565, 568 (S.C. 1979)).  It is well-

settled South Carolina law that "the term 'arising out of' when used in an insurance

policy exclusion should be narrowly construed to mean 'caused by.'"  <u>Id.</u> (citing

<u>McPherson v. Michigan Mut. Ins. Co.</u>, 426 S.E.2d 770 (S.C. 1993)).

 The Selective Policy's Additional Insured Endorsement includes a provision that

excludes certain claims from coverage:

> With respect to the insurance afforded to these additional insureds, the following additional <u>exclusions</u> apply:
>
> This insurance does not apply to:
>
> "Bodily injury", "property damages" or "personal and advertising injury" <u>arising out of the rendering of, or the failure to render, any professional architectural, engineering or surveying services</u>, including:
>
> (1)    The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or
>
> (2)    Supervisory, inspection, architectural or engineering activities.

ECF No. 57-6 at 176 (emphasis added) (the "Professional Services Exclusion").

Construing the exclusion strictly against Selective, the court can easily conclude that it

does not exclude the claims contained in the underlying lawsuit.  DRB is not a

professional architecture, engineering, or surveying company, and the underlying lawsuit

contains numerous claims against DRB that have nothing to do with "professional

architectural, engineering or surveying services."  The court cannot construe the

exclusion to exclude claims from coverage that allege run-of-mill construction

negligence.

In support of its contention, Selective cites two South Carolina cases that interpret the phrase "arises out of" in the context of worker's compensation. <u>See</u> ECF No. 138 at 9 (citing <u>Nicholson v. S.C. Dep't of Soc. Servs.</u>, 769 S.E.2d 1 (S.C. 2015) and <u>Barnes v. Charter 1 Realty</u>, 768 S.E.2d 651 (S.C. 2015)). The court finds these cases unpersuasive, especially given the South Carolina caselaw that interprets the phrase in the context of an insurance policy exclusion. Selective also cites to <u>Peagler v. USAA Ins. Co.</u>, 628 S.E.2d 475 (S.C. 2006), along with a number of out-of-state cases, to convince the court to construe the phrase "arises out of" broadly. Not one of these cases interprets the phrase in the context of an insurance policy exclusion. In the context of an exclusion, South Carolina law is clear. <u>See</u> <u>Owners Ins. Co.</u>, 614 S.E.2d at 614 ("the term 'arising out of' when used in an insurance policy exclusion should be narrowly construed to mean 'caused by.'"). The court therefore relies on the South Carolina case law directly on point and rejects this argument.

In sum, the court cannot grant summary judgment to either party on DRB's declaratory judgment claim. Summary judgment is not warranted on behalf of Selective because whether DRB is entitled to coverage as an additional insured to the Selective Policy depends on disputed issues of material fact. DRB is not entitled to summary judgement for the same reason, as well as because its estoppel argument fails. As such, DRB's declaratory judgment claim as to Selective's duty to defend and indemnity DRB in the underlying suit survives and proceeds to trial.

**D. DRB's Remaining Claims**

Having resolved the legal issues put before it, the court must now determine the practical effect of its findings. By way of clarification, DRB and Selective have both

filed motions for summary judgment. DRB's motion requests summary judgment solely on its declaratory judgment claim, which asks the court to find that Selective has a duty to defend and indemnify DRB in the underlying lawsuit. Selective's motion, on the other hand, asks the court to grant summary judgment with respect to "all claims against it . . ." ECF No. 138 at 13. Despite posturing its motion as one for summary judgment on all of DRB's claims, Selective only makes substantive arguments with respect to DRB's declaratory judgment claim, regarding Selective's alleged duty to defend. Selective does not specifically request summary judgment on DRB's other claims for bad faith, indemnification, or promissory estoppel. Nor does Selective's motion explicitly address these claims.

However, this order's analysis into DRB's declaratory judgment claim has required the court to determine issues that are part and parcel to DRB's promissory estoppel claim. Specifically, this order has found that Selective is not estopped from denying coverage to DRB because DRB's reliance on the certificates of insurance was unreasonable as a matter of law. This finding goes to the very heart of DRB's promissory estoppel claim. "The elements of promissory estoppel are (1) an unambiguous promise by the promisor; (2) reasonable reliance on the promise by the promisee; (3) reliance by the promisee was expected by and foreseeable to the promisor; and (4) injury caused to the promisee by his reasonable reliance." N. Am. Rescue Prod., Inc. v. Richardson, 769 S.E.2d 237, 241 (S.C. 2015) (citing Davis v. Greenwood Sch. Dist. 50, 634, 620 S.E.2d 65, 67 (S.C. 2005)). DRB's claim for promissory estoppel cannot stand because this order finds that its reliance on the certificates of insurance was not reasonable. Therefore, the court's finding renders the claim untenable.

Next, the court turns to DRB's bad faith claim. "The elements of a bad faith refusal to pay action are (1) the existence of a contract of insurance between the parties; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action; and (4) causing damage to the insured." Crossley v. State Farm Mut. Auto. Ins. Co., 415 S.E.2d 393, 396–97 (S.C. 1992). "But if there is a reasonable ground for contesting a claim, there is no bad faith." Helena Chem. Co. v. Allianz Underwriters Ins. Co., 594 S.E.2d 455, 462 (S.C. 2004) (quoting Crossley v. State Farm Mut. Auto. Ins. Co., 415 S.E.2d 393, 397 (S.C. 1992) (internal quotation marks omitted). DRB has admitted that it has lost some of the documents that it claims would otherwise establish coverage in this case. Although the Selective Policy does not require DRB to present a contract to prove it is entitled to additional insured coverage, it would make little sense to hold that Selective's denial of coverage, in the absence of such a contract, was unreasonable. Based on that fact and the lengthy analysis above, Selective had reasonable grounds for its conclusion that DRB was not an additional insured under the Selective Policy. Therefore, DRB's claim for bad faith must fail.

As such, the court finds itself at a procedural fork in the road[6] and must choose between the lesser of two evils. The court must either grant summary judgment on DRB's claims of bad faith and promissory estoppel in favor of a party who did not explicitly request it or deny summary judgment and send legally untenable claims to a jury. The court determines that the latter is the greater evil, so it proceeds with the former. Thus, because the court's findings necessitate it, the court grants summary

---

[6] As the sagacious Yogi Berra once said, "When you come to a fork in the road, take it."

judgment in favor of Selective with respect to DRB's claims for promissory estoppel and bad faith.

The same cannot be said for DRB's remaining claim for indemnification / contribution. Although the court is unsure of the nature or validity of the indemnification DRB seeks—be it contractual or equitable—the court is unwilling to grant summary judgment on a claim that may be viable in favor of a party who has not explicitly requested it. Without such a request or findings that necessitate summary judgment, the court declines to consider DRB's claim for indemnification / contribution at present and denies Selective's motion for summary judgment with respect to the same.

In sum, after the court's resolution of the instant motions, DRB's declaratory judgment and indemnification claims survive and will proceed to trial; DRB's bad faith and promissory estoppel causes of action are resolved on summary judgment in favor of Selective.

## IV.  CONCLUSION

For the foregoing reasons the court **DENIES** plaintiffs' motion for summary

judgment and **GRANTS IN PART** defendant's motion with respect to plaintiffs' second

and fourth causes of action and **DENIES IN PART** defendant's motion with respect to

plaintiffs' first and third causes of action.

      **AND IT IS SO ORDERED.**

      **DAVID C. NORTON**
      **UNITED STATES DISTRICT JUDGE**

**April 3, 2020**
**Charleston, South Carolina**